UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FRATERNITY FUND LTD., et al.,

                Plaintiffs,

      -against-                                  03 Civ. 2387 (LAK)

BEACON HILL ASSET MANAGEMENT LLC, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**

        Appearances:

                Scott M. Berman
                Emilio A. Galvan
                BROWN RUDNICK BERLACK ISRAELS LLP
                *Attorneys for Plaintiffs*

                Seth M. Schwartz
                Jonathan Frank
                Edward Flis
                SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                *Attorneys for Defendants Asset Alliance Corporation and*
                *Milestone Global Advisors, L.P.*

LEWIS A. KAPLAN, *District Judge.*

        This securities fraud action is before the Court on a motion by defendants Milestone

Global Advisors, L.P. ("Milestone Global") and Asset Alliance Corporation ("Asset Alliance") to

dismiss the claims by plaintiffs Balentine Global Hedge Fund, L.P. ("Balentine Global") and

Balentine Global Hedge Fund Select, L.P. ("Balentine Select") (collectively, the "Balentine

Plaintiffs") in favor of arbitration or, in the alternative, for failure to state a claim and/or for failure

to plead fraud with particularity.  For the reasons that follow, the motion to dismiss in favor of

arbitration is granted.

*The Complaint*

At the center of this action is an alleged valuation fraud involving hedge funds that invested in mortgage-backed and related securities.[1] According to the amended complaint ("Complaint"), the Balentine Plaintiffs invested in Milestone Plus Partners, L.P. ("Milestone") between January 2001 and January 2002.[2] Milestone Global, the fund's general partner, allegedly misrepresented in the Milestone offering memorandum that the fund's net asset value ("NAV") would be calculated in good faith using independent prices.[3] Contrary to those representations, the fund's manager, defendant Beacon Hill Asset Management, LLC, and later its administrator, defendant ATC Fund Services (Cayman) Limited, allegedly overpriced the fund's portfolio when determining NAV.[4] Milestone Global then sent monthly statements to the Balentine Plaintiffs containing the false and misleading valuations.[5] It allegedly "knowingly or recklessly failed to perform an independent calculation or otherwise verify the value of Milestone's portfolio."[6] Plaintiffs allegedly were injured because they invested or retained their investments in reliance upon

---

[1] Cpt. ¶¶ 1-5.

[2] *Id.* ¶ 15. Milestone is a Delaware limited partnership. *Id.* ¶ 30.

[3] *Id.* ¶¶ 43-50, 388-89.

[4] *Id.* ¶¶ 80-81.

[5] *Id.* ¶¶ 79-82.

[6] *Id.* ¶ 391.

the misstatements. The Complaint alleges that Asset Alliance, which owned 99 percent of Milestone Global and shared the same officers and directors, is liable on the ground that it controlled Milestone Global.[7]

The Balentine Plaintiffs bring claims against Milestone Global for violations of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"),[8] and Rule 10b-5 thereunder,[9] and for common law fraud and breach of fiduciary duty.[10] They sue Asset Alliance for control person liability under Section 20(a) of the Exchange Act[11] and for common law fraud, breach of fiduciary duty, and aiding and abetting those torts.[12]

Milestone Global moves to dismiss on the ground that the claims must be arbitrated pursuant to the Milestone Amended and Restated Limited Partnership Agreement ("Partnership Agreement"). Asset Alliance, although not a party to the agreement, argues that it may compel arbitration under principles of estoppel or, in the alternative, that the Balentine Plaintiffs' claims should be dismissed or stayed pending the outcome of the arbitration.

---

[7] *Id.* ¶¶ 401-02, 412, 432.

[8] 15 U.S.C. § 78a *et seq.*

[9] 17 C.F.R. § 240.10b-5.

[10] *See* claims 22 (securities fraud), 24 (common law fraud), 26 (breach of fiduciary duty).

[11] 15 U.S.C. § 78t(a).

[12] *See* claims 23 (control person liability), 24 (common law fraud), 25 (aiding and abetting common law fraud), 26 (breach of fiduciary duty), 27 (aiding and abetting breach of fiduciary duty).

*Discussion*

A.    *Who Decides Arbitrability*

As an agreement affecting interstate commerce, the Partnership Agreement is subject

to the Federal Arbitration Act ("FAA").[13]  Under the FAA, the policy in favor of arbitration generally

requires that any ambiguity about the scope of arbitrable issues be decided in favor of arbitration.[14]

The presumption, however, is reversed where the ambiguity concerns who decides arbitrability.[15]

The issue of arbitrability is for the court "unless there is 'clear and unmistakable' evidence from the

arbitration agreement, as construed by the relevant state law, that the parties intended that the

question of arbitrability shall be decided by the arbitrator."[16]

The Second Circuit has identified the following New York rules of contract

interpretation as relevant to deciding whether the agreement clearly and unmistakably evidences the

parties' intent to arbitrate arbitrability: "(1) in interpreting a contract, the intent of the parties

governs; (2) [a] contract should be construed so as to give full meaning and effect to all of its

provisions; (3) words and phrases in a contract should be given their plain meaning; and (4)

---

[13]    *See* 9 U.S.C. §§ 1, 2; *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996) (citing *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Plaintiffs do not dispute defendants' assertion that the Partnership Agreement affects interstate commerce.

[14]    *PaineWebber*, 81 F.3d at 1198 (citing *Moses H. Cone*, 460 U.S. at 24-25).

[15]    *Id.* (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 944 (1995)).

[16]    *Id.*

ambiguous language should be construed against the interest of the drafting party."[17]

Under New York law, an arbitration clause may clearly and unmistakably evidence the parties' intent to arbitrate arbitrability "even absent an express contractual commitment" to that effect.[18]  In *PaineWebber Incorporated v. Bybyk*,[19] for example, the Second Circuit held that a broadly worded clause requiring arbitration of "any and all" controversies constituted clear and unmistakable evidence of the parties' intent to arbitrate questions of arbitrability.[20]  The court explained that the clause was "inclusive, categorical, unconditional and unlimited."[21]

An arbitration clause, however, does not need to be unlimited in order sufficiently to evidence the parties' intent to arbitrate questions of arbitrability.  In *Shaw Group Incorporated v.*

---

[17]
 *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (internal quotation marks omitted) (citing *PaineWebber*, 81 F.3d at 1199).  The parties' briefs cite, for the most part, cases applying New York law, and "such 'implied consent . . . is sufficient to establish choice of law.'" *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) (quoting *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).  In any event, where, as here, the parties are silent about the choice of law question, the Court may apply the law of the forum.  *See Michele Pommier Models v. Men Women NY Model Mgmt.*, 14 F. Supp. 2d 331, 336 (S.D.N.Y. 1998) (citing *Keles v. Yale University*, 889 F. Supp. 729, 733 (S.D.N.Y. 1995)).

[18]
 *Shaw Group*, 322 F.3d at 121 (citing *PaineWebber*, 81 F.3d at 1199-1200).

[19]
 81 F.3d 1193.

[20]
 *Id.* at 1199-1200.

[21]
 *Id.* at 1199; *accord Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 46, 666 N.Y.S.2d 990, 993-94 (1997) (clause requiring arbitration of "any controversy" was sufficiently "plain and sweeping" as to establish clear and unmistakable evidence of parties' intent to arbitrate arbitrability).

*Triplefine International Corporation*,[22] the agreement at issue committed to arbitration "[a]ll disputes . . . *concerning or arising out of*" the agreement.[23]  The Second Circuit held that the agreement clearly and unmistakably evidenced the parties' intent to arbitrate questions of arbitrability because it (1) was "broadly worded" despite the qualifying language, and (2) incorporated the rules of the International Chamber of Commerce, which empower the arbitrator to decide questions of arbitrability.[24]

At issue in this case is the arbitration clause in section 10.8 of the Partnership Agreement, which states:

> "The parties hereto agree that all controversies and disputes between and/or among any of the parties hereto with respect to the meaning, construction, validity and/or enforceability of this Agreement or which may arise in connection with any transaction contemplated by this Agreement shall be determined by arbitration to be held in the City of New York, and in accordance with the rules then obtaining of the American Arbitration Association; provided, however, that (a) the arbitrator(s) shall be experienced and knowledgeable in industry standards and practices and in the matters under dispute, (b) the authority of the arbitrator(s) shall be limited to construing and enforcing the terms and conditions of this Agreement as expressly set forth herein, and (c) the arbitrator(s) shall state the reasons for, and the factual determinations, legal analysis, and legal conclusions underlying, their award in a

---

[22] 322 F.3d 115.

[23] *Id.* at 121 (emphasis added).

[24] *See id.* at 121-22; *accord Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir 2005) ("We have held that when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); *cf. Sacharow*, 91 N.Y.2d at 46, 666 N.Y.S.2d at 994 (the court's conclusion that a broadly worded arbitration clause clearly and unmistakably evidenced the parties' intent to arbitrate questions of arbitrability was "buttresse[d]" by the fact that the agreement incorporated arbitral rules that empower the arbitrator to decide issues of arbitrability).

written opinion."[25]

This clause clearly and unmistakably evidences the parties' intent to submit questions of arbitrability to an arbitrator. Although not unlimited, it is broad and easily encompasses the issue of arbitrability. It reaches "all controversies and disputes" that fall into at least one of two categories: (1) those "with respect to the meaning, construction, validity and/or enforceability of this Agreement" and (2) those "which may arise in connection with any transaction contemplated by this Agreement." It contains the phrase "all controversies and disputes," and the second category contains the elastic phrases "in connection with" and "any transaction contemplated by this Agreement."[26] Moreover, it expressly includes disputes with respect to the "meaning" and "construction" of the agreement, which cover a dispute over whether a claim falls within the scope of the arbitration clause.[27]

Nor do plaintiffs contest the broad scope of the phrase "all controversies and disputes

---

[25]

Partnership Agmt. § 10.8 (emphasis in original). The Balentine Plaintiffs do not dispute the validity or enforceability of the Partnership Agreement, which is attached to the Frank Declaration as Exhibit G1.

[26]

*Cf. ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 34 (2d Cir. 2002) (concluding that a clause that required arbitration of "any dispute [that] shall arise between the parties . . . with reference to the interpretation of this Agreement or their rights with respect to any transaction involved" was "broad in scope"); *Hartford Accident & Indem. Co. v. Swiss Reins. Am. Corp.*, 246 F.3d 219, 224 (2d Cir. 2001) (describing a clause that required arbitration of "any dispute [that] shall arise between [the parties] . . . with reference to the interpretation of this Agreement or their rights with respect to any transaction involved" as having a "broad scope" ).

[27]

Black's Law Dictionary defines "construction" as "[t]he act or process of interpreting or explaining the sense or intention of a writing," and "meaning" as "that which is conveyed (or intended to be conveyed) by a written or oral statement or other communicative act." BLACK'S LAW DICTIONARY 308, 995 (7th ed. 1999).

. . . which may arise in connection with any transaction contemplated by this Agreement," which they characterize as "catch-all language."[28]  Instead, they argue that, under the doctrine of *ejusdem generis*, the phrase is limited by the specific enumeration that precedes it.

This doctrine, which "literally mean[s] 'of the same kind or class,' applies where there is an enumeration or listing of specific things, followed by more general words relating to the same subject matter, in which case the general words are interpreted as meaning things of the same kind as the specific matters to which the parties refer."[29]  But it has no bearing here.  The phrase "which may arise in connection with any transaction contemplated by this Agreement" is not part of the list embedded in the phrase that precedes it ("meaning, construction, validity and/or enforceability").  It is separated from the list by the disjunctive "or."  Interpreting the list so as to include the "any transaction" phrase would require an unnatural and distorted reading of the clause and render meaningless the words that separate the list from that phrase (i.e., the "and/or" that signals the end of the list and the disjunctive "or which may arise in connection with" that marks the beginning of the new phrase).  The doctrine of *ejusdem generis* is an aid to be used when the meaning of a word or phrase is unclear, but it is inappropriate where it renders words or phrases meaningless or otherwise defeats the parties' intent.[30]

---

[28]

Pls. Br. at 73-74.

[29]

11 WILLISTON ON CONTRACTS § 32.10 (4th ed. 2004); *see also Zurich Am. Ins. Co. v. ABM Indus.*, 397 F.3d 158, 165 (2d Cir. 2005) (defining ejusdem generis as "a rule of statutory construction under which 'general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'").

[30]

*See, e.g.*, *Zurich Am. Ins.*, 397 F.3d at 165 (rejecting an application of *ejusdem generis* that renders words and phrases meaningless); *Bath & H. R. Co. v. New York State Dep't of Envtl. Conservation*, 73 N.Y.2d 434, 441, 541 N.Y.S.2d 732, 735 (1989) (improper to

Plaintiffs further argue that provision (b) in the arbitration clause, which limits the arbitrators' authority, narrows the scope of arbitration to disputes about "construing and enforcing" the agreement. The Court disagrees. Provision (b) states that "the authority of the arbitrator(s) shall be limited to construing and enforcing the terms and conditions of this Agreement as expressly set forth herein." It does not, however, not diminish the broad scope of the "all controversies and disputes" language. On the contrary, it recognizes the arbitrators' authority to construe and enforce the "terms and conditions" of the agreement, one of which is the requirement that the parties arbitrate "all controversies and disputes" described in the earlier passage. In other words, the arbitrators act within their authority when they construe and enforce the "all controversies and disputes" provision. Plaintiffs' interpretation, moreover, would make the "all controversies and disputes" provision superfluous. New York law prefers an interpretation of a contract that gives words and phrases full meaning and effect over one that renders them meaningless.[31] This Court's interpretation gives meaning and effect not only to the "all controversies and dispute" provision, but to provision (b) as

---

apply *ejusdem generis* where doing so defeats legislative rather than aids in ascertaining it); *People v. J. R. Cooperage Co., Inc.*, 72 N.Y.2d 579, 584, 535 N.Y.2d 353, 355-56 (1988) (rejecting application of *ejusdem generis* that conflicts with the purpose of a statute); *cf. Mason v. United States*, 260 U.S. 545, 554 (1923) ("The rule [of *ejusdem generis*] is one well established and frequently invoked, but it is, after all, a rule of construction, to be resorted to only as an aid to the ascertainment of the meaning of doubtful words and phrases, and not to control or limit their meaning contrary to the true intent. It cannot be employed to render general words meaningless, since that would be to disregard the primary rules, that effect should be given to every part of a statute, if legitimately possible, and that the words of a statute or other document are to be taken according to their natural meaning.").

[31] *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible. Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.") (internal quotation marks and citations omitted).

well. The latter states that arbitrators are limited "to construing and enforcing the terms and conditions of this Agreement *as expressly set forth herein*." (emphasis added). Among other things, this phrase prevents the arbitrators from rewriting the terms of the agreement or fashioning new terms and conditions.

The parties' intent to arbitrate questions of arbitrability is further evidenced by the Partnership Agreement's incorporation of the rules of the American Bar Association, which state that "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[32] The incorporation of these rules is clear and unmistakable evidence of the parties' intent to arbitrate arbitrability.[33]

Accordingly, the broad wording of the arbitration clause, together with its incorporation of arbitral rules that empower the arbitrator to decide issues of arbitrability, constitute clear and unmistakable evidence of the parties' intent to arbitrate arbitrability.

B.    *Ability of Non-Signatory to Compel Arbitration*

Although it is not a signatory to the Partnership Agreement, defendant Asset Alliance argues that it nevertheless may compel arbitration because plaintiffs seek to hold it responsible for Milestone Global's alleged misconduct.[34] "[U]nder principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful

---

[32]
   AAA Commercial Arbitration Rule R-7(a).

[33]
   *Contec*, 398 F.3d at 208.

[34]
   Plaintiffs do not address defendants' contention that Asset Alliance may compel arbitration despite not being a party to the agreement.

review of 'the relationship among the parties, the contracts they signed . . ., and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'"[35]

Here, the close relationship among the parties, controversies, and contract is sufficient to support a finding of estoppel. First, as plaintiffs themselves assert, there is a close relationship between Asset Alliance and Milestone Global. They allege, among other things, that Asset Alliance owned 99 percent of Milestone Global, that the two companies shared the same principal place of business and had the same officers and directors, and that Asset Alliance's president signed the allegedly false and misleading monthly reports.[36] Similarly, the issues that Asset Alliance seeks to arbitrate are closely tied to the controversy with Milestone Global, as Asset Alliance's alleged liability is premised solely upon its alleged control of and responsibility for the actions of Milestone Global.

In addition, the claims against Milestone Global (and therefore the claims against Asset Alliance) are intertwined with the Partnership Agreement. Plaintiffs allege that Milestone Global knowingly or recklessly overstated the fund's NAV in monthly statements and that it misrepresented to plaintiffs that NAV "would be calculated properly, in good faith, and pursuant to . . . independent methods, using third-party broker marks."[37] Although plaintiffs do not allege breach of contract, their claims depend upon obligations and rights set forth in the Partnership Agreement.

[35]

*JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004) (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)).

[36]

*See, e.g.*, Cpt. ¶¶ 401, 412.

[37]

*Id.* ¶¶ 43, 48-50, 79-82, 388.

That agreement provides for the issuance of the monthly NAV reports that plaintiffs allege were misleading, describes the method used to calculate NAV, and sets limitations on the general partner's liability. Plaintiffs' claims therefore are intertwined with rights and obligations in the Partnership Agreement.[38] Accordingly, the Balentine Plaintiffs are estopped from refusing to arbitrate their claims against Asset Alliance.

*Conclusion*

The motion by defendants Milestone Global and Asset Alliance [docket item number 21] to compel arbitration by the Balentine Plaintiffs is granted. The Court shall enter judgment accordingly and close.

SO ORDERED.

Dated: June 6, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[38]

Indeed, plaintiffs allege that "Milestone Global repeated the[] misrepresentations [about its methodology for calculating NAV] . . . in the Limited Partnership Agreement . . ." *Id.* ¶ 389.