UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FRATERNITY FUND LTD., et al.,

                    Plaintiffs,

        -against-                             03 Civ. 2387 (LAK)

BEACON HILL ASSET MANAGEMENT LLC, et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

> Scott M. Berman
> Emilio A. Galvan
> BROWN RUDNICK BERLACK ISRAELS LLP
> *Attorneys for Plaintiffs*
>
> Joel M. Miller
> Charles R. Jacob III
> Teresa A. Gonsalves
> MILLER & WRUBEL P.C.
> *Attorneys for Defendants Beacon Hill Asset Management*
> *LLC and Safe Harbor Asset Management LLC*
>
> Kevin H. Marino
> John D. Tortorella
> MARINO & ASSOCIATES, P.C.
> *Attorneys for Defendant John D. Barry*
>
> Robert G. Stahl
> LAW OFFICES OF ROBERT G. STAHL, LLC
> *Attorneys for Defendant John W. Irwin*
>
> Lawrence S. Lustberg
> Thomas R. Valen
> GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, P.C.
> *Attorneys for Defendant Thomas P. Daniels*

Michael Critchley
Michael Critchley, Jr.
MICHAEL CRITCHLEY & ASSOCIATES
*Attorneys for Defendant Mark Miszkiewicz*

Seth M. Schwartz
Jonathan Frank
Edward Flis
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
*Attorneys for Defendant Asset Alliance Corporation*

LEWIS A. KAPLAN, *District Judge.*

This is a private securities action based on an alleged valuation fraud involving three hedge funds.

Over the course of October and November 2002, the funds' managers made a series of disclosures revealing that the net asset values of the funds had declined from the values reported as of August 31, 2002. Each subsequent disclosure revealed that the decline was greater than previously thought, with the final disclosure revealing that the NAVs had declined by 61.22 percent. The announcements prompted grand jury and SEC investigations and a number of civil actions, including this one. Now before the Court are motions to dismiss the amended complaint ("Complaint") by (1) Beacon Hill Asset Management, LLC ("Beacon Hill"), Safe Harbor Asset Management, LLC ("Safe Harbor Asset Management"), and their four principals, defendants John D. Barry, Thomas Daniels, John Irwin, and Mark Miszkiewicz (collectively, the "Beacon Hill Defendants") and (2) Asset Alliance Corp. ("Asset Alliance").[1]

---

[1] The Court recently granted a motion by Milestone Global Advisors, L.P. and Asset Alliance to dismiss the claims of two plaintiffs, Balentine Global Hedge Fund, L.P. and Balentine Hedge Fund Select, L.P., in favor of arbitration. *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, No. 03 Civ. 2387 (LAK), 2005 WL 1324971 (S.D.N.Y. June 6, 2005). Other motions to dismiss have been filed as well by (1) ATC Fund Services (Cayman) Ltd., (2) Amsterdam Trust Corp., B.V., and (4) Ernst & Young LLP, and (4) Ernst & Young Cayman

*I.  Background*

*A.  The Complaint*

      1.  The Funds

The three hedge funds at the center of this action are Bristol Fund, Ltd. ("Bristol"), Safe Harbor, L.P. ("Safe Harbor"), and Milestone Plus Partners, L.P. ("Milestone") (collectively, the "Funds").[2]  They invested in mortgage-backed and related securities.[3]

Bristol and Safe Harbor were created and managed by the Beacon Hill Defendants.[4] Milestone was managed by Milestone Global Advisors, L.P. ("Milestone Global") and, pursuant to an agreement in 1998 with Milestone Global, the Beacon Hill Defendants.[5]  In January 2002, Beacon Hill announced its adoption of a master feeder fund structure under which the Funds became "feeder funds" into Beacon Hill Master, Ltd. ("Beacon Hill Master").[6]  Beacon Hill Master managed their trading.[7]

---

Islands.  They remain pending.

[2]

    Cpt. ¶¶ 1, 6.  Bristol is a Cayman Islands exempted limited liability company, Safe Harbor a New Jersey limited partnership, and Milestone a Delaware limited partnership.  *Id.* ¶¶ 28-30.  Milestone was created in 1994 and the other funds in 1997.  *Id.*

[3]

    *Id.* ¶¶ 33-35.

[4]

    *Id.* ¶ 1.  Bristol and Safe Harbor allegedly were created to invest primarily on behalf of off-shore and domestic investors, respectively.  *Id.* ¶¶ 28-29.

[5]

    *Id.* ¶¶ 1, 23, 36.

[6]

    *Id.* ¶ 37.

[7]

    *Id.*

2.    The Alleged Fraud

The Complaint alleges three categories of misstatements and omissions by the Beacon Hill Defendants.

First, from March 2000 through September 2002, the defendants allegedly overstated the net asset values ("NAVs") of Bristol and Safe Harbor in audited financial statements and monthly performance reports ("MPRs").[8]  These documents allegedly stated "that each Funds' [*sic*] NAV was steadily increasing with little volatility and virtually no negative months . . . . [when] [i]n fact the Funds were losing money . . ."[9]  Allegedly, "[t]hese losses were exacerbated in the summer of 2002 after Beacon Hill accumulated for the Funds a significant short position in U.S. Treasuries on a highly leveraged basis -- apparently betting on an increase in interest rates.  When interest rates continued to fall, the value of the Funds' portfolio continued to drop."[10]

Second, defendants allegedly represented in offering memoranda, audited financial statements, due diligence questionnaires, and meetings with investors that the NAVs of Bristol and Safe Harbor had been or would be calculated using independent prices.[11]    Rather than use

---

[8]    *Id.* ¶¶ 4, 6, 52-58, 64, 99-101.

[9]    *Id.* ¶ 4 (monthly performance reports); *see also id.* ¶¶ 99-101 (audited financial statements).

[10]    *Id.* ¶ 4; *see also id.* ¶ 64 ("These losses were compounded by the Beacon [Hill] Defendants ill-fated speculation on the direction of interest rates beginning in July 2002.").

[11]    *Id.* ¶¶ 41-51.

independent prices, however, defendants used their own allegedly fraudulent valuations.[12]

Finally, defendants allegedly misrepresented in offering memoranda and audited financial statements that NAVs were calculated in good faith.[13]

### 3.  The Collapse

The Beacon Hill Defendants allegedly concealed the Funds' losses until they made three disclosures in October and November 2002 that revealed the extent of losses.

First, "[o]n October 8, 2002, Beacon Hill disclosed to investors, including the plaintiffs, that the NAVs of the Funds declined by an estimated 25% in September.  This disclosure was prompted by [its primary broker] Bear Stearns' refusal to provide additional financing due to the material over-valuation of the portfolios and Bear Stearns reporting this situation to the SEC."[14]

Second, "[o]n October 17, 2002, following inquiries from the SEC, Beacon Hill disclosed to investors, including the plaintiffs, that, as of September 30, 2002, the NAVs for the Funds actually declined by 54% from the reported NAVs as of August 31, 2002.  In this disclosure, Beacon Hill admitted that a portion of the Funds' losses occurred prior to August 31, 2002."[15]

Finally, "[o]n November 27, 2002, Beacon Hill disclosed that the NAV of the Funds

---

[12]  *Id.* ¶¶  47-51.

[13]  *Id.* ¶¶ 42-51.

[14]  *Id.* ¶ 201.

[15]  *Id.* ¶ 202.

had actually declined by 61.22 % from the NAV reported as of August 31, 2002."[16]  The Complaint alleges that, "[i]n actuality, the NAVs of the Funds had been declining for years."[17]

### 4.    The Defendants

The Complaint alleges the following about the defendants.

Beacon Hill is a Delaware limited liability company formed in 1997 by its four principals -- Barry, Daniels, Irwin, and Miszkiewicz (collectively the "Individual Defendants") -- to serve as an investment manager of hedge funds that invested in mortgage-backed and related securities.[18]  As of 1998, Asset Alliance, through two wholly owned subsidiaries, allegedly owned 50 percent of Beacon Hill and the Individual Defendants the other 50 percent.[19]

The Individual Defendants were principals and directors of Beacon Hill.[20]  Barry was president and director of marketing and "responsible for the daily management of the firm."[21]  Daniels was chief investment officer and "direct[ed] the overall risk management of the firm."[22]

---

[16]
> *Id.* ¶ 203.

[17]
> *Id.* ¶ 204.

[18]
> *Id.* ¶¶ 16, 33.

[19]
> *Id.* ¶ 16.

[20]
> *Id.* ¶¶ 16-19.

[21]
> *Id.* ¶ 17 (quoting Bristol and Safe Harbor offering memoranda).

[22]
> *Id.* ¶ 18 (quoting Bristol and Safe Harbor offering memoranda).

Miszkiewicz was chief financial officer and Irwin a senior portfolio manager.[23]

Safe Harbor Asset Management is a New Jersey limited liability company and the general partner of Safe Harbor.[24] Beacon Hill owned 99 percent and Barry one percent of it.[25]

Milestone Global is a Delaware limited liability partnership and the general partner of Milestone.[26] Asset Alliance owned 99 percent.[27] In or around 1998, Milestone Global and Beacon Hill entered into an agreement pursuant to which Beacon Hill provided Milestone with investment management services.[28]

Asset Alliance is a Delaware corporation that acquired a 50 percent interest in Beacon Hill in 1998.[29] Its practice allegedly was to purchase 50 percent interests in investment managers such as Beacon Hill.[30] It then provided its affiliates with advice in "marketing and distribution services, strategic planning and administration, as well as back-office support and systems."[31]

---

[23]
    *Id.* ¶¶ 19-20.

[24]
    *Id.* ¶ 21.

[25]
    *Id.* ¶ 16.

[26]
    *Id.* ¶ 23.

[27]
    *Id.*

[28]
    *Id.*

[29]
    *Id.* ¶¶ 22, 65.

[30]
    *Id.* ¶ 65.

[31]
    *Id.* ¶ 66 (quoting Asset Alliance Form S-1).

None of the Funds is a party to this action.

5.      The Plaintiffs and Their Claims

Plaintiffs are 36 shareholders and/or limited partners of the Funds.[32]  They invested, in aggregate, $106 million between September 1997 and September 2002.[33]  All but two of the plaintiffs invested in Bristol and/or Safe Harbor, but not Milestone.  Plaintiffs Balentine Global Hedge Fund, L.P. and Balentine Hedge Fund Select, L.P. ("Balentine Plaintiffs") invested only in Milestone.[34]

The Complaint asserts six claims against the Beacon Hill Defendants.  Four claims are brought by all plaintiffs except for the Balentine Plaintiffs.  These claims allege violations of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act")[35] and state common law.[36]  The remaining two claims are brought by the Balentine Plaintiffs on state law theories.[37]

The Complaint makes five claims against Asset Alliance.  Three are brought by all

---

[32]

*Id.* ¶¶ 14-15.

[33]

*Id.* ¶¶ 1, 14-15.

[34]

*Id.* ¶ 15.  As the Court has granted the motion by Milestone Global Advisors and Asset Alliance to compel arbitration of the Balentine Plaintiffs' claims against them, this Opinion does not further discuss those claims.  *See supra* note 1.

[35]

15 U.S.C. § 78a *et seq.*

[36]

Claim 1 (securities fraud); claim 2 (common law fraud); claim 3 (breach of fiduciary duty); claim 4 (negligence and negligent misrepresentation).

[37]

*See* claim 25 (aiding and abetting common law fraud); claim 27 (aiding and abetting breach of fiduciary duty).

of the plaintiffs and allege control person liability under Section 20(a) of the Exchange Act[38] and violations of state common law.[39]  Two are brought by plaintiff Sanpaolo IMI Alternative Investments SGR SpA ("Sanpaolo") on state common law theories and relate to Sanpaolo's investments in Bristol.[40]

Finally, the plaintiffs who invested in Safe Harbor ("Safe Harbor Plaintiffs") assert a state law claim against Safe Harbor Asset Management.[41]

### B.    Proceedings

The disclosures by Beacon Hill in the fall of 2002 prompted an action by the SEC.[42] Without admitting or denying liability, the Beacon Hill Defendants consented to entry of a final judgment and injunction pursuant to which they were obliged to pay $2.2 million in disgorgement and $2 million in civil penalties.[43]

Plaintiffs commenced this action on April 8, 2003.  The Court subsequently granted motions by the Beacon Hill Defendants and Asset Alliance to dismiss the corrected and supplemental

---

[38]

15 U.S.C. § 78t(a).

[39]

*See* claim 12 (control person liability); claim 13 (aiding and abetting common law fraud); claim 14 (aiding and abetting breach of fiduciary duty).

[40]

*See* claim 20 (breach of contract); claim 21 (breach of fiduciary duty).

[41]

*See* claim 33 (breach of contract).

[42]

*SEC v. Beacon Hill Asset Mgmt. LLC*, No. Civ. A.02-8855 (LAK) (S.D.N.Y. 2002).

[43]

*SEC v. Beacon Hill Asset Mgmt. LLC*, No. Civ. A.02-8855 (LAK), 2004 WL 2404096 (S.D.N.Y. Oct. 28, 2004).

complaint for failure to satisfy the requirements of Rule 9(b) and the PSLRA.[44]  The Complaint was

filed on June 24, 2004.

## II.  Standards Governing Motions to Dismiss

In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual

allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.[45]  Dismissal

is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support

of his claim which would entitle him to relief."[46]  A district court may consider the full text of

documents attached as exhibits to the complaint or incorporated by reference.[47]

As this is a securities fraud case, the Complaint must meet the heightened pleading

requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").[48]

The PSLRA requires that a complaint alleging misstatements or omissions "specify each statement

---

[44]

*Alteram S.A. v. Beacon Hill Asset Mgmt. LLC*, No. 03 Civ. 2387 (LAK), 2004 WL 367709
(S.D.N.Y. Feb. 27, 2004).

[45]

*Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 143 (2d Cir. 2003); *Levy v. Southbrook Int'l
Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002).

[46]

*Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson,* 355 U.S.
41, 45-46 (1957)).

[47]

*See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).  The Court
considers the text of various documents attached as exhibits to the Complaint, including
offering memoranda, due diligence questionnaires, the SEC Complaint, and a report
("Liquidator's Report") by the provisional liquidator appointed by a Cayman Islands court
in provisional liquidation proceedings for Beacon Hill Master and Bristol. *See In re Beacon
Hill Master, Ltd.*, No. 692 (Cayman Is. 2003); *In re Bristol Fund, Ltd.*, No. 592 (Cayman
Is. 2003).

[48]

Pub. L. No. 104-67, 109 Stat. 737 (1995).

alleged to have been misleading" and "the reason or reasons why the statement is misleading."[49]  In addition, where allegations of misstatements and omissions are made on information and belief, the complaint must "state with particularity all facts on which that belief is formed."[50]

Three requirements of Rule 9(b) are relevant to this motion.  First, Rule 9(b) requires that plaintiffs alleging fraud state "the circumstances constituting fraud . . . with particularity."[51]  Allegations that are "conclusory" or "unsupported by assertions of fact" are insufficient.[52]  Second, the rule requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[53]  Finally, Rule 9(b) generally does not permit information and belief allegations except for matters that are "peculiarly within the opposing party's knowledge,"[54] in which case the allegations must be "accompanied by a statement of facts upon which the belief is founded."[55]

---

[49]

15 U.S.C. § 78u-4(b)(1).

[50]

*Id.*

[51]

Fed. R. Civ. P. 9(b).

[52]

*Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

[53]

*Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)), *cert. denied*, 531 U.S. 1012 (2000).

[54]

*Luce*, 802 F.2d at 54 n.1 (quoting *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974), *overruled on other grounds by Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1100 n.9, 1100-06 (1991)).

[55]

*Id.* (citing *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972)); *Schlick*, 507 F.2d at 379.

*III.  Section 10(b) Claims*

In order to state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with *scienter*, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."[56]  *Scienter* is "an intent to deceive, manipulate or defraud."[57]

Plaintiffs allege that the Beacon Hill Defendants misrepresented (1) the NAVs of Bristol, Safe Harbor and Beacon Hill Master, (2) that independent prices had been or would be used to calculate the NAVs of those funds, and (3) that the assets of those funds would be valued in good faith in arriving at the stated NAVs.

*A.      Net Asset Values*

Plaintiffs allege that the audited financial statements and MPRs of Bristol, Safe Harbor, and Beacon Hill Master overstated NAVs and misrepresented that NAVs were steadily increasing when, in fact, the Funds were losing money.[58]  The Complaint identifies the dates,[59]

---

[56]

*Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir. 2000) (citing *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 155-56 (2d Cir. 1998)).

[57]

*Id.* at 168 (quoting  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

[58]

Cpt. ¶¶ 4, 64.

[59]

Plaintiffs challenge the MPRs for March 2000 through August 2002 and the audited financial statements for the periods that ended between March 2000 and March 2002.  *Id.* ¶¶ 56, 103.

speakers,[60] and recipients of the documents.[61]  The facts supporting the assertion that the NAVs were materially false and misleading, however, are made on information and belief.

Where allegations are made on information and belief, two separate inquiries are required to determine whether plaintiffs have pleaded with particularity facts sufficient to support their beliefs.[62]  First, plaintiffs' factual allegations must be based on based on adequate sources. Plaintiffs must identify sufficiently the sources upon which their beliefs are based and those sources must have been likely to have known the relevant facts.[63]  Second, the underlying factual allegations must justify the inference that plaintiffs urge.[64]  In other words, plaintiffs must allege facts sufficient to justify the assertion that the NAVs were inflated and that the amount of the inflation would have

---

[60]

Under the group pleading doctrine, plaintiffs may "rely on a presumption that statements in 'prospectuses, registration statements, annual reports, press releases, or other group-published information,' are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (quoting *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp.2d 1096, 1108 (D.Nev. 1998)); *accord In re NTL, Inc. Sec. Litig.*, 347 F. Supp.2d 15, 22 n.26 (S.D.N.Y. 2004).  This allows plaintiffs, to a limited extent, to "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of fraudulent intent" and remains available after enactment of the PSLRA.  *In re Keyspan Corp. Sec. Litig.*, No. 01 Civ. 5852 (ARR), 2003 WL 21981806, at *13 n.3 (E.D.N.Y. July 30, 2003) (quoting *In re CINAR Corp. Sec. Litig.*, 186 F. Supp.2d 279, 318 (E.D.N.Y. 2002)).  Plaintiffs have alleged sufficiently that the Individual Defendants were insiders with direct involvement in the daily affairs of the company. Hence, for purposes of this motion, they are responsible for statements in audited financial statements, MPRs, due diligence questionnaires, and press releases even where the statements at issue were made by others.

[61]

The Complaint identifies the particular documents that each plaintiff allegedly received.

[62]

*In re NTL*, 347 F. Supp.2d at 23.

[63]

*Id.*

[64]

*Id.*

been material to a reasonable investor.[65]

Here, the subsidiary factual allegations that plaintiffs rely upon are based upon the Liquidator's Report,[66] statements made by Beacon Hill to investors, and the SEC Complaint.[67] These are adequate for Rule 9(b) and PSLRA purposes. The question therefore is whether the factual allegations drawn from these sources support the conclusion that the NAVs were materially false and misleading.

The Complaint alleges that Beacon Hill's prime broker, Bear Stearns, independently valued the securities in the Funds' portfolios and arrived at prices that would have resulted in portfolio valuations that were lower than the valuations published by the Beacon Hill Defendants. Valuations based on Bear Stearns prices would have been between 10 to 16.32 percent lower from March 2000 through June 2002, save for April 2002, when the difference would have been 24.46 percent, 31.43 percent lower in July 2002, and 37.62 percent lower in August 2002.[68] In addition, Fong -- an independent valuation expert hired by Beacon Hill after the Funds collapsed -- allegedly

---

[65]

A misstatement or omission is material if it would have been considered significant by a reasonable investor in making investment decisions. *Basic Inc., v. Levinson,* 485 U.S. 224, 231 (1988). This depends upon whether a disclosure would have been viewed by a reasonable investor as altering the "total mix of information." *Id.* at 231-32.

[66]

*See supra* note 47.

[67]

The SEC Complaint was filed after an investigation during the course of which this Court ordered the Beacon Hill Defendants to comply with SEC investigative subpoenas.

[68]

Cpt. ¶¶ 56 (monthly performance reports), 99 (audited financial statements). The difference in valuations was 10 to 15 percent in March 2000 and March 2001, 16.32 percent in March 2002, 24.46 percent in April 2002, 12.45 percent in May 2002, and 15.08 percent in June 2002. *Id.* ¶ 6.

arrived at prices "largely in agreement with the Bear Stearns prices."[69] But these allegations, standing alone, do not justify an inference that the NAVs were materially false and misleading.

As this Court previously has noted, the defendants' hedge funds "involved non-exchange listed securities, the valuation of which may differ depending on the model used in the calculations."[70] In other words, valuation of such securities was not a matter of looking up closing prices in the *Wall Street Journal*, but involved the exercise of judgment. The Complaint does not allege with particularity that the models used or the judgments made by Bear Stearns or Fong were superior to those used or made by Beacon Hill or other independent parties. Nor do plaintiffs allege with particularity that the alleged differences in valuations were outside the range of what is considered normal in the industry. Nevertheless, plaintiffs allege more.

The Complaint alleges that three of the Individual Defendants engaged in self-dealing in the months just prior to the Funds' collapse. Defendants Barry, Daniels, and Irwin allegedly maintained a personal account at Beacon Hill known as Asset Risk Management, LLP ("ARM").[71] In late July 2002, "Irwin (on behalf of himself, Daniels and Barry) arranged for Beacon Hill to sell two bonds from [Beacon Hill Master] to ARM, each at a price substantially below the value that Beacon Hill had placed upon it. When they subsequently sold the two bonds back to [Beacon Hill Master] in September [2002], the three Beacon Hill principals made almost $500,000 from the

---

[69]

*Id.* Fong's analysis was limited to the period from April through September 2002. *See* Cpt. Ex. A (Liquidator's Report ¶¶ 42, 46).

[70]

*Beacon Hill*, 2004 WL 367709, at *2 n.5.

[71]

Cpt. ¶ 212.

earlier purchases."[72]  Then, in September 2002, just one month prior to disclosing the major NAV

drop, these defendants allegedly:

> "liquidated most of the ARM portfolio by selling the nine largest bonds to [Beacon Hill Master].  These three principals received a total of approximately $16 million from the liquidation . . . [which they] transferred out of ARM's brokerage account at Bear Stearns in October 2002.  Then, these principals transferred such monies, in their wives' names, to another fund in which they had ownership interest."[73]

Plaintiffs further allege that when Beacon Hill disclosed in October 2002 that the NAVs had declined

by 54 percent from the values reported as of August 31, 2002, it admitted that a portion of the losses

had occurred prior to August 31, 2002.[74]

In these circumstances, the Complaint justifies an inference that the NAVs were

overstated during the period April through fall 2002.  The disparity between NAVs based on Beacon

Hill prices and those based on Bear Stearns prices more than doubled between June and July 2002,

increasing from 15.08 to 31.43 percent and reaching 37.62 percent in August.  While judgments

about valuation of complex securities can vary, one is not obliged to credit the notion that they

suddenly varied by a factor of two absent some persuasive explanation, and none has been offered.

Moreover, it was during this period that three of the four Individual Defendants allegedly profited

from self-dealing, in part by buying bonds from Beacon Hill Master at prices lower than the values

that defendants placed on these bonds for purposes of computing the Funds' NAVs.  Although the

Bear Stearns/Beacon Hill valuation disparity in April occurred several months prior to the alleged

---

[72]       *Id.* (quoting SEC Cpt. ¶ 94).

[73]       *Id.* ¶ 213 (citing SEC Cpt. ¶ 106) (internal citations and quotation marks omitted).

[74]       *Id.* ¶ 202.

self-dealing, the difference of 24.46 percent during that month was arguably high enough -- when considered in light of the 31.43 percent and 37.62 percent figures in July and August -- and sufficiently close in time to the alleged self-dealing so as to justify an inference of fraud in that month as well.  But this is not to say that an inference of overvaluation is permissible for the entire two-and-a-half-year period from March 2000 through fall 2002, as alleged in the Complaint.

The only specific factual allegations pertaining to 2000, 2001, and early 2002 are that the portfolio valuations based on Bear Stearns prices were lower than those based on Beacon Hill prices.[75]  As indicated above, a bald allegation that the valuations were overstated would be insufficient.  Indeed, plaintiffs allege that the disparity between valuations based on Bear Stearns prices and those based on Beacon Hill prices generally fluctuated between 10 to 16 percent between March 2000 and June 2002, save for the higher figure in April 2002.  Given the nature of the assets valued and the lack of any alleged self-dealing during that period, the Court sees no basis for concluding that plaintiffs have alleged with particularity any misstatements or omissions as to the valuations prior to April 2002.

Accordingly, the Court holds that plaintiffs have pled facts sufficient to justify their claims that the Beacon Hill Defendants overstated the NAVs of the Funds, but only in the period April through fall 2002.

The remaining allegations upon which plaintiffs rely are either too conclusory to pass muster under the heightened pleading requirements or do not give rise to an inference of fraud.  They

---

[75]     The Fong analysis covers the period April through September 2002.  Cpt. Ex. A (Liquidator's Report ¶ 46).  In addition, the allegation that Beacon Hill admitted in October 2002 that a portion of the losses had occurred prior to August 2002 does not give rise to an inference of wrongdoing in 2000, 2001 and early 2002 because it does not indicate what portion of the losses occurred prior to August 2002 or approximately when they occurred.

allege, for example, that the Beacon Hill Defendants used an improper two-part methodology to value the Funds' positions. The first step in the alleged methodology involved the calculation of "hedge-adjusted" prices."[76] The Beacon Hill Defendants allegedly used a computer program that "changed the 'prices of the [collateralized mortgage obligations] in [Beacon Hill Master] to adjust the value of the long side portfolio in the opposite direction, but in approximately the same amount, as the change in the value of the hedge.'"[77] The problem with this allegation, however, is that plaintiffs do not explain why the hedge-adjustment resulted in inflated NAVs or otherwise was fraudulent. Adjustments to reflect the composition of the portfolio would not necessarily be improper.

The second step in defendants' methodology allegedly was to "manually manipulate[] and inflate[] the prices in the Funds' portfolios in order to report positive returns, when the Funds were actually losing money."[78] Plaintiffs do not allege, however, the dates or amounts of the manual adjustments or any other particulars about the manipulation. Accordingly, this allegation is too conclusory to pass muster under Rule 9(b) and the PSLRA.

Finally, plaintiffs allege that the liquidator confirmed that the Funds were "materially inflated."[79] This allegation not only is too conclusory to support an inference of fraud (it does not explain, for example, the basis for or meaning of the liquidator's alleged conclusion), it misstates

---

[76] Cpt. ¶ 48 (quoting SEC Cpt. ¶ 41).

[77] *Id.* (quoting SEC Cpt. ¶¶ 41-42).

[78] *Id.* ¶ 50 (citing SEC Cpt. ¶¶ 42-45).

[79] *Id.* ¶ 4; Pls. Mem. at 29.

the Liquidator's Report. Plaintiffs have not referred to, and the Court has not found, any language in the report indicating that, in the liquidator's view, Beacon Hill materially inflated the NAVs. On the contrary, the liquidator merely disclosed the valuations reached by Bear Stearns and Fong. He disavowed any view as to whether Fong's analysis was accurate, cautioned that Fong's findings were preliminary, and, on the issue of whether a fraud had taken place, suggested that a conclusion from these findings "*may be* that [Beacon Hill] . . . *perhaps* . . . consistently overvalued certain securities," but he never reached such a conclusion himself.[80] The allegation that the liquidator determined Beacon Hill's valuations to be materially inflated therefore is without merit.

Accordingly, the Complaint alleges facts sufficient to proceed with the claim that defendants reported false and misleading NAVs in the period from April through fall 2002. To the extent that the Complaint is based upon statements about NAVs made prior to that time, it is dismissed.

### B. Independent Marks

The Complaint alleges that the Beacon Hill Defendants misrepresented that they valued the securities in Bristol and Safe Harbor using independent prices. They allegedly made these misrepresentations in four settings: offering memoranda, audited financial statements, due diligence questionnaires, and meetings.

---

[80] Cpt. Ex. A (Liquidator's Report ¶ 45).

1.     Offering Memoranda

The Complaint alleges that the Bristol and Safe Harbor offering memoranda falsely promised to use independent prices to value the securities in the funds but that defendants instead used their own prices.[81]  Defendants argue that the offering memoranda made no such promises.[82]

The Complaint focuses on following statement in the Bristol and Safe Harbor offering memoranda concerning the method that would be used to calculate NAV:

> "Any Security for which the primary market is on a securities exchange will be valued as at the last sale price on such exchange on the Valuation Date, or if no sale occurred on that day, at the most recent quoted bid price on that day. Such Securities as well as other Securities for which the primary market is believed to be over the counter will be valued at the mid-market price provided by one or more principal market makers unless, in the opinion of the Investment Manager, the value so obtained does not fairly indicate the market value of any Security, in which case the Investment Manager may value the Security based upon the value of other securities believed to be comparable and valuation models used by the Investment Manager. Securities or other assets for which market quotations are not readily available will be valued at their fair value as determined in good faith in accordance with the

---

[81]

    *Id.* ¶ 47.

[82]

    Plaintiffs assert that the promises in the offering memoranda constituted securities fraud on two theories.  First, they allege that promises made in the offering memoranda published during the alleged fraud were false when made because defendants secretly intended not to perform.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("A person who promises to perform a specific act in the future, while secretly intending not to perform, violates Rule 10b-5, provided that the promise is given as consideration for the transfer of securities.").  They assert also that offering memoranda published prior to the alleged fraud became false when defendants departed from the methodology stated therein and failed to disclose the change.  *See In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998)  ("A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event. . . . There is . . . no need to update when the original statement was not forward looking and does not contain some factual representation that remains 'alive' in the minds of investors as a continuing representation, or if the original statements are not material.") (internal citations omitted).  The Court does not need to address whether plaintiffs adequately have pled a secret intent not to perform or a duty to update because plaintiffs fail to plead with particularity that defendants in fact made the alleged promises.

procedures adopted by the Investment Manager."[83]

It alleges that the quoted language was false and misleading because it promised to use independent prices to value the securities in the funds when, in fact, defendants had no intention of doing so.[84]

Plaintiffs misread this language. It did not guarantee that independent prices would be used to value the securities but instead identified several methods of valuation that would be used, depending on the type of security. It promised to use prices from market makers only for securities that were traded on an exchange or over-the-counter, assuming the investment manager considered the market maker prices fairly to indicate market value. The Complaint does not allege that the securities in the funds were traded on an exchange or over-the-counter.[85] Nor does it allege that market maker prices were available and that the investment manager unreasonably determined that such prices did not fairly reflect the value of the securities. Accordingly, plaintiffs' allegation that the offering memoranda falsely promised to use independent prices is baseless.

---

[83]

Cpt. ¶ 42. The Bristol Offering Memorandum, originally dated March 15, 1997, was amended on December 12, 2002 and June 1, 2002. The Safe Harbor Offering Memorandum was originally dated November 3, 1997 and amended on June 1, 2002. *Id.*

[84]

*Id.*

[85]

On the contrary, the Bristol offering memoranda stated that "[t]he Fund's securities are generally not traded on an exchange and there are no published prices to which the Investment Manager may refer in valuing the Fund's securities. The Investment Manager will independently value the Fund's securities based upon certain models and the prices quoted for similar securities." Cpt. Ex. B (1997 Bristol Offering Mem. at 28; 2000 Bristol Offering Mem. at 31). Similarly, the Safe Harbor offering memoranda cautioned that "[s]ome of the Securities or positions may not be traded on an exchange, or may be thinly traded, making valuation and the determination of the resulting gain or loss subject to the General Partner's judgment." *Id.* (1997 Safe Harbor Offering Mem. at 28; 2002 Safe Harbor Offering Mem. at 33).

2.     Audited Financial Statements

Plaintiffs further allege that the audited financial statements misrepresented that the valuations they contained had been calculated using independent prices.[86] Defendants argue that the financial statements, contrary to plaintiffs' assertion, disclosed that the valuations had been determined by the Funds' investment managers.

The only sentences in the 2000 and 2001 Bristol financial statements that the Complaint challenges provided that "[s]ecurities are valued at their fair value as determined in good faith by the Funds' investment manager."[87] This language does not state that the portfolios had been marked to independent values. Accordingly, plaintiffs' claim that these documents misrepresented that independent prices had been used is without merit.

The other financial statements at issue were different. According to the Complaint, they stated that:

> "The financial statements include investments in mortgage-backed securities, U.S. Treasury Bonds, repurchase and reverse repurchase agreements whose estimated fair values, in the absence of readily ascertainable market values, have been established using prices furnished by investment services firms (such as brokers, dealers or other entities). The Investment Manager uses an Option Adjusted Spread ('OAS') model to value mortgage-backed securities. The OAS model takes into account current interest rates and prepayments spreads to determine future cash flows which are then discounted to arrive at the current value. The Investment Manager compares [the] valuation to quotes from brokers to ensure the valuation is reasonable."[88]

---

[86]    Plaintiffs take issue with the audited financial statements of Bristol, Safe Harbor, and Beacon Hill Master for the periods ending between March 2000 and March 2002. Cpt. ¶ 103.

[87]    *Id.* ¶ 45.

[88]    *Id.* ¶ 44.

An investor reasonably could infer from this statement that independent prices had been used to calculate the value of the securities in the portfolios. The problem, however, is that the Complaint fails to explain with particularity why these statements were false.

It alleges that "in March 2002 . . . Daniels deliberately selected individual prices [from multiple dealers and Bloomberg] that, in aggregate, allowed Beacon Hill to match the portfolio value generated by its own internal valuation methodology . . . The final, carefully selected, prices were submitted to E&Y Cayman and E&Y LLP."[89] This allegation, however, is too conclusory to satisfy Rule 9(b) and the PSLRA. The Complaint does not allege, for example, what method Beacon Hill used to select independent prices or the amount by which the prices selected from dealers and Bloomberg resulted in materially misleading NAVs.

Accordingly, plaintiffs' claim that the audited financial statements misrepresented that independent prices had been used is dismissed.

3. Due Diligence Questionnaires

According to the Complaint, the Beacon Hill Defendants misrepresented in due diligence questionnaires sent to three plaintiffs that Beacon Hill used repurchase agreement ("repo") prices to value the securities in the Funds when they instead used their own allegedly fraudulent

---

[89] *Id.* ¶ 51 (quoting SEC Cpt. ¶ 47).

prices.[90]  The questionnaires are dated May and June 2002.[91]

a.      Particularity of Alleged Misstatements and Omissions

Defendants argue that the Complaint does not adequately plead falsity because it alleges that Beacon Hill represented that it *utilized* repo prices, but not that it *valued* the portfolio *at* such prices.  As long as Beacon Hill "utilize[d] the repo marks in some manner," defendants argue, the statements in the questionnaires were accurate.[92]

This argument is without merit.  Stating that repo prices were used when, in fact, they were used in an inconsequential way, might be technically correct but nevertheless misleading.[93]  Indeed, the alleged misstatements were given in response to the question, "How do you mark the liquid positions in your portfolio?"[94] Defendants responded that Beacon Hill "utiliz[ed] prices received from the repo market."[95]  It did not qualify this response by disclosing that repo prices were

_____

[90]

Id. ¶¶ 106, 129, 142.  The Court does not address allegations with respect to an October 2001 due diligence questionnaire (*see id.* ¶ 171) because the plaintiff who allegedly relied upon that report did not make a purchase during the period of the alleged fraud.  *See* Section III(D) *infra.*

[91]

Cpt. ¶¶ 106, 129, 142.

[92]

*See* Beacon Hill Defs. Mem. Sched. II.

[93]

*See* Rule 10b-5(b) (unlawful to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading").

[94]

Cpt. Exs. L ¶ 4.10, N ¶ 3.27, O ¶ 4.10.

[95]

*Id.*

used in an insignificant manner. An investor reasonably would have understood the statement to mean that Beacon Hill valued the securities based upon prices from the repo market.

### b. Particularity of Factual Allegations

To support their assertion that defendants' statements about using repo prices were false when made, plaintiffs essentially rely upon the same factual allegations that they use to support their claim that the NAVs were materially false and misleading.[96] These same factual allegations support the conclusion that the Beacon Hill Defendants did not use prices from the repo market to value the securities from April through fall 2002. Accordingly, plaintiffs adequately have pled that the statements in the due diligence questionnaires were false and misleading when made.

### 4. Meetings

The Complaint further alleges that the Beacon Hill Defendants misrepresented during meetings between 1997 and August 2002 the extent to which they used independent prices to value the securities in the Funds.[97] Most of the alleged statements occurred prior to April 2002 and, for the reasons previously noted, plaintiffs have not pled facts sufficient to show that these statements were false when made.

The problem with the remaining statements (and with the aforementioned statements as well) is that the Complaint does not adequately identify which statements allegedly were false and

---

[96] *See* Cpt. ¶¶ 49-50; Pls. Mem. at 11-12, 30.

[97] Cpt. ¶¶ 104-200.

misleading or explain why they were so. As an example, defendants allegedly stated during one meeting that "[e]ach week, Beacon Hill valued the portfolio by requesting bids from different dealers . . ."[98] But the Complaint does not allege that Beacon Hill did not in fact value the portfolio on a weekly basis using bids from different dealers. Accordingly, the claims, to the extent based on these allegations, are dismissed.

C.      *Good Faith*

The final category of alleged misstatements consists of representations in offering memoranda and audited financial statements that NAVs had been or would be calculated in good faith, when allegedly they were not.

As discussed above, plaintiffs allege facts sufficient to justify their assertion that the Beacon Hill Defendants did not calculate NAVs in good faith, but only during the period between April and fall 2002. Because all of the financial statements that plaintiffs challenge are dated March 2002 and earlier, their claims that the audited financial statements were false when made are without merit. By contrast, the amended offering memoranda for Bristol and Safe Harbor are dated June 1, 2002, during the period of the alleged fraud. Plaintiffs have alleged facts sufficient to show that these statements were false when made.

---

[98] *Id.* ¶ 109.

D.     *"In Connection" With the Purchase or Sale of Securities*

The Beacon Hill Defendants further argue that claims premised on purchases made prior to the alleged fraud were not made in connection with the alleged misstatements and omissions and therefore must be dismissed. Section 10(b) and Rule 10b-5 prohibit securities fraud "in connection with the purchase or sale" of securities. Accordingly, to state a claim thereunder, a plaintiff must allege that he was an actual purchaser or seller of securities.[99] Among the potential plaintiffs barred by this rule are persons injured by "decisions to hold or refrain from trading."[100]

Here, plaintiffs allege purchases and sales of investments in Bristol and Safe Harbor between September 1997 and September 2002. However, as explained above, plaintiffs' allegations of materially false and misleading statements are sufficient only with respect to misstatements and omissions from April through fall 2002. Accordingly, claims based on purchases or sales made prior to that time were not made in connection with the alleged fraud and are dismissed.[101]

---

[99]

*See, e.g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 321-22 (2d Cir. 2002).

[100]

*First Equity Corp. v. Standard & Poor's Corp.*, 869 F.2d 175, 180 n.2 (2d Cir. 1989); *accord Blue Chip*, 421 U.S. at 737-38 (investors who "decide not to sell their shares because of an unduly rosy presentation or a failure to disclose unfavorable material" lack standing to sue under Section 10(b) and Rule 10b-5).

[101]

Plaintiffs allege only purchases (and no sales) between April and September 2002. Cpt. ¶ 15. Indeed, plaintiffs who purchased before the alleged fraud and sold during it would have benefitted from the inflated prices. The eight plaintiffs whose federal securities claims against the Beacon Hill Defendants are dismissed in their entirety for failure to allege any purchases during the period of the alleged fraud are: Austin Capital & Radix Sterling Fund, Ltd.; Coastal Capital Ltd.; Meliora Low Volatility Funds; M. Nicholson; W. Nicholson; Trust fbo M.L. Nicholson; Stillwater Market Neutral Fund, L.P.; and Van Diversified Low Volatility Fund, Ltd.

E.      *Loss Causation*

Defendants move to dismiss on the additional ground that plaintiffs have not pled loss causation.

A securities fraud plaintiff must plead and prove loss causation, which is "a causal connection between the material misrepresentation and the loss."[102]  Generally, a plaintiff does not adequately plead loss causation by alleging merely that the price of a security on the date of purchase was inflated as a result of the misrepresentation or omission.[103]  "Such an allegation -- which 'is 'nothing more than a paraphrased allegation of transaction causation' -- explains why a particular investment was made, but does not speak to the relationship between the fraud and the loss of the investment."[104]  Instead, "to establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.'"[105]  Accordingly, the loss causation element requires "both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk."[106]

---

[102]

*Dura Pharms., Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005).

[103]

*Id.* at 1631-33.  Although *Dura* was a fraud-on-the-market case, its reasoning is equally applicable here.  The Court based its ruling in part on the fact that "the logical link between the inflated share purchase price and any later economic loss is not invariably strong . . . . [I]f, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."  *Id.* at 1631.  The same is true here.  If a purchaser sold his investment in the Funds before the truth about NAVs became known, the alleged misstatements would not have caused his losses.

[104]

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005).

[105]

*Id.* at 175 (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)) (emphasis added by *Lentell*).

[106]

*Id.* at 173 (emphasis in original).

Here, plaintiffs adequately allege that the subject of the first category of misrepresentations caused their injury. They assert that the Beacon Hill Defendants materially overstated NAVs and concealed losses from April through September 2002, that plaintiffs purchased securities at inflated prices in reliance upon the misrepresentations, and that plaintiffs were injured when the overvaluation -- the subject of the alleged misrepresentations -- was revealed.

Defendants argue that there can be no loss causation because plaintiffs' losses supposedly were caused by a drop in interest rates. According to the Liquidator's Report, they argue, investors like Beacon Hill Master, which held short positions in U.S. Treasury securities, lost money during the summer of 2002 when interest rates fell.[107] But this assertion, even if true, would not necessarily explain all of the Funds' losses.[108] Moreover, as previously noted, plaintiffs' allegations suggest that defendants delayed in revealing the decline in the Funds' NAV. Even if a decline in interest rates prompted that decline, defendants' failure to disclose the decline on a timely basis caused injury to investors who purchased at inflated prices and were injured when the decline was revealed.

Finally, plaintiffs adequately plead loss causation for the second and third categories of misstatements -- that the Beacon Hill Defendants promised to value the securities in good faith and/or using independent prices. They assert that the Beacon Hill Defendants misrepresented that the Funds' NAVs were calculated in good faith and/or using repo prices, that the NAVs instead were

---

[107] Beacon Hill Defs. Mem. at 18.

[108] Cf. Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003) ("If the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.").

based on the defendants' own valuations, that defendants' valuations fraudulently concealed losses, that plaintiffs purchased at inflated prices in reliance upon the misrepresentations, and that plaintiffs were injured when the losses were disclosed, a disclosure that caused the Funds' collapse. These allegations are sufficient to show that the subject matter of the alleged misrepresentations -- that prices would be valued in good faith and using independent prices -- caused plaintiffs' losses.

*F.*      Scienter

Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."[109]  This may be done "either (a) by alleging facts that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[110]  "[T]he inference may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor."[111]

The Complaint plainly alleges adequately that three Individual Defendants had motive and an opportunity to commit fraud. Barry, Daniels, and Irwin allegedly engaged in two self-dealing

---

[109]      15 U.S.C. § 78u-4(b)(2).

[110]      *Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir. 1995) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); *see also Kalnit* v. *Eichler,* 264 F.3d 131, 138 (2d Cir. 2001); *Ganino,* 228 F.3d at 169-70.

[111]      *Novak*, 216 F.3d at 311.

transactions on the eve of the collapse. They allegedly purchased bonds from Beacon Hill Master at prices below the valuations they had placed on them and then sold them back to Beacon Hill Master for a profit. In addition, they allegedly sold other personal assets to Beacon Hill Master for a profit and transferred the monies to accounts in their wives' names. These allegations are sufficient to establish motive. As these defendants were three of only four principals at Beacon Hill and directly involved in the management of the firm, they had an opportunity to commit fraud.

The allegations are sufficient for defendant Miszkiewicz as well, but under the conscious misbehavior or recklessness test. As chief financial officer, Miszkiewicz allegedly "had access to the pricing sheets reflecting Beacon Hill's internal valuations, and supervised the calculation of NAV using these prices."[112] In addition, the Complaint alleges that Beacon Hill represented to investors that it obtained third-party prices, including daily downloads from its primary broker, Bear Stearns, to ensure the soundness of internal valuations.[113] It is reasonable to infer that Miszkiewicz, in his capacity as chief financial officer, had access to these independent prices, which would have revealed the misleading nature of the internal valuations. In addition, as one of only four principals and directors, he allegedly collaborated with the other Individual Defendants in their "small suite of offices" and therefore had ample opportunity to become familiar with the work of Daniels and Irwin, who performed the pricing analyses. These allegations give rise to a strong inference that he acted recklessly with respect to whether the valuations were materially false and misleading.

---

[112] Cpt. ¶ 63.

[113] *E.g.*, *id.* ¶¶ 106, 109, 129, 142, 146, 171.

Inasmuch as plaintiffs adequately allege that the Individuals Defendants had *scienter*, they adequately allege the same for Beacon Hill.

## G.     Other

The Court has reviewed defendants' remaining grounds for dismissal of the federal securities claims and determined that they are either moot in light of the foregoing or without merit.

## IV.  Control Person Liability

Plaintiffs allege that Asset Alliance is liable as a control person for the alleged primary violation by Beacon Hill.  Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."[114]

The Complaint sufficiently alleges control, which is "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."[115]  Asset Alliance allegedly owned 50 percent of Beacon Hill,

---

[114]

15 U.S.C. § 78t(a).

[115]

17 C.F.R. § 240.12b-2; *see also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (adopting this standard for a Section 20(a) claim).

making it the single largest shareholder.[116]   In addition, the Beacon Hill Amended and Restated

Limited Liability Company Agreement ("LLC Agreement") allegedly "vest[ed]" Asset Alliance

generally with "management and control" of the business of Beacon Hill.[117]   Among other things,

it authorized Asset Alliance to take "such actions as may be necessary to cause [the Beacon Hill

Defendants] to comply with any Applicable Law."[118]   Indeed, Asset Alliance represented in a due

diligence report that it "monitor[ed] and review[ed]" Beacon Hill's portfolio risks, and "ensure[d]

that the portfolios' marks are consistent with market values."[119]   These allegations are more than

sufficient to allege control.

Asset Alliance argues that plaintiffs misread the LLC Agreement.  It points to other

provisions of the agreement which, it contends, severely restricted the rights identified by

plaintiffs.[120]   Its interpretation of the agreement is unpersuasive[121] and, moreover, overlooks other

---

[116]

     Cpt. ¶ 9.

[117]

     *Id.* ¶ 71; *see also* Frank Decl. Ex. B at 21 (LLC Agreement § 2.1(a)).

[118]

     Cpt. ¶ 71; *see also* Frank Decl. Ex. B at 21 (LLC Agreement § 2.1(b)).

[119]

     Cpt. ¶ 69.

[120]

     Asset Alliance Mem. at 13-16.

[121]

     Asset Alliance argues, for example, that the provision authorizing it to cause Beacon Hill "to comply with any Applicable Law or this Agreement" could be enforced only by terminating a member of Beacon Hill for cause.  The Court sees no such restriction in the provision, which authorized Asset Alliance to take "*such actions as may be necessary* to cause the Company, any of its Affiliates or any of its Members to comply with any Applicable Law or this Agreement." Frank Decl. Ex. B at 21 (LLC Agreement § 2.1(b)) (emphasis added).

     Asset Alliance further challenges plaintiffs' allegation that § 2.1(a) delegated to Asset

rights it obtained in the agreement.[122]

Asset Alliance further argues that plaintiffs must allege, in addition to a primary violation and control over the primary violator, culpable participation by the control person. This is an issue on which the courts, both within and outside this circuit, are deeply divided.[123] But this Court previously has ruled that no such allegation is required and adheres to that view.[124]

Accordingly, Asset Alliance's motion to dismiss the control person claim is denied.

---

Alliance "management and control." It points to § 2.2(b), which it contends overrides § 2.1(a) by delegating "management and control" to the Individual Defendants. But Asset Alliance reads this provision too broadly. Section 2.1(a) contains several subsections. Subsection (i) states that "the management and control of the business . . . shall be vested generally in the Manager," and subsection (ii) states that "the Manager, as specified or limited . . . in Section 2.2 and elsewhere, shall have exclusive power and authority, in the name of and on behalf of the Company, to perform all acts and do all things which in its sole discretion it deems necessary or desirable to conduct the business of the Company." Contrary to defendant's argument, § 2.2(b) appears to delegate to the Individual Defendants only the powers stated in subsection (ii). It does not override the granting in subsection (i) of "management and control . . . generally in the Manager."

[122]

*E.g.*, § 2.2(b)(i) ("number of members of the Management Board may be . . ., with the consent of the Manager, decreased"); *id.* § 2.2(b)(ii) ("With the consent of the Manager any vacancy on the Management however occurring may be filled by the Management Board, providing that the person filling such vacancy meets certain qualifications acceptable to the Manager."); § 2.2(c) (requiring consent of Manager to, among other things, "create . . . any Indebtedness of [Beacon Hill] . . . in an amount exceeding $75,000," "take or omit any action which could reasonably be expected to result in termination of employment of any Member of [Beacon Hill]," and "admit any Person as a Member").

[123]

*See In re NTL*, 347 F. Supp.2d at 37 n.127 (collecting cases).

[124]

*E.g.*, *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2005 U.S. Dist. LEXIS 12553, at *86-87 (S.D.N.Y. June 28, 2005).

## V. State Law Claims

Plaintiffs assert claims against the Beacon Hill Defendants for common law fraud, breach of fiduciary duty, and negligence and negligent misrepresentation.[125] They allege also aiding and abetting common law fraud and aiding and abetting breach of fiduciary duty against Asset Alliance.[126] In addition, the Safe Harbor Plaintiffs assert a claim against Safe Harbor Asset Management for breach of contract,[127] and plaintiff Sanpaolo asserts claims against Asset Alliance for breach of contract and breach of fiduciary duty.[128]

---

[125]

See claims 2-4.

[126]

See claims 13-14.

[127]

See claim 33.

[128]

See claims 20-21. Plaintiffs contend that the Court should exercise supplemental jurisdiction over the state law claims against the Beacon Hill Defendants by the ten plaintiffs who allege no federal securities claim against them but have brought federal claims against other defendants. See 28 U.S.C. § 1367(a) (supplemental jurisdiction exists over claims that are "so related to" claims over which the court has original jurisdiction that "they form part of the same case or controversy under Article III of the United States Constitution"). These include the eight plaintiffs who did not purchase securities during the period of the alleged fraud, see supra Section III(D), as well as the Balentine Plaintiffs. The Court need not decide whether their claims form part of the same case or controversy as the claims over which the Court has original jurisdiction. Even if that were the case, the Court would decline to exercise supplemental jurisdiction. See 28 U.S.C. § 1367(c). These plaintiffs reside in different jurisdictions throughout the United States and other parts of the world (e.g., Texas, Australia, and Ireland, to name a few). Presiding over these claims would require the Court to resolve difficult issues of choice of law and, if New York choice of law favors the jurisdiction where the alleged conduct or injury occurred, to apply the laws of those numerous jurisdictions. Such a task is all the more daunting given that the number of plaintiffs who have failed to state a federal securities claim against the Beacon Hill Defendants is not insignificant relative to the total number of plaintiffs -- they make up more than a quarter. Entertaining these claims, moreover, would disservice the interests of other jurisdictions in protecting their own citizens. The Court therefore declines to exercise supplemental jurisdiction over the state law claims against the Beacon Hill Defendants by plaintiffs who allege no federal securities claim them. Those claims are dismissed for lack of subject matter jurisdiction.

Claims that sound in fraud are subject to the requirements of Rule 9(b).[129]  The Beacon Hill Defendants and Asset Alliance move to dismiss the state law claims under Rule 9(b) for failure to plead fraud with particularity and/or under Rule 12(b)(6) for failure to state a claim.

*A.      Claims Against Beacon Hill Defendants*

1.      Common Law Fraud (Claim 2)

"A New York common law fraud claim is defined as a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury."[130]  Where an omission rather than a misrepresentation is alleged, the plaintiff must demonstrate that the defendant had a duty to disclose.[131]  The elements of common law fraud thus are largely the same as those of a Rule 10b-5 claim except that there is no requirement that the fraud be "in connection with the purchase or sale of securities."[132]  In other words, a claim for common law fraud is available to investors who retain

---

129

> *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (heightened pleading standard of Rule 9(b) applies to claims under Section 11 and Section 12(a)(2) of the Securities Act of 1993 where the claims are predicated on averments of fraud, even though fraud is not an element of those claims).

130

> *Suez Equity Investors*, 250 F.3d at 104-05 (citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803 (1969)).  The parties' briefs assume that New York law applies to plaintiffs' state law claims.  Such "implied consent . . . is sufficient to establish choice of law." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) (citing *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).

131

> *E.g.*, *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995).

132

> *E.g.*, *Manela v. Garantia Banking*, 5 F. Supp.2d 165, 178-79 (S.D.N.Y. 1998).  As with Rule 10b-5, knowledge or recklessness is sufficient to satisfy the *scienter* element for

their securities in reliance on a defendant's misrepresentations.[133]

Insofar as plaintiffs adequately have pled a federal securities fraud claim against the Beacon Hill Defendants, they have stated also a claim under New York common law for the same alleged misrepresentations. Unlike the federal securities claim, however, the common law fraud claim reaches alleged injuries based upon plaintiffs' decisions to retain their investments in reliance upon the alleged fraud.

Defendants argue that the tort claims must fail because they merely allege violations of contract obligations. As nearly as the Court understands it, this argument applies to the Safe Harbor Plaintiffs, who allege a breach of their limited partnership agreement.[134]

"It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."[135] Such a duty may be independent of a contract and yet emerge from a relationship of trust and confidence

---

[133] common law fraud. *See, e.g., Suez Equity Investors*, 250 F.3d at 104-05.

*E.g., Cont'l Ins. Co. v. Mercadante*, 222 A.D. 181, 225 N.Y.S. 488 (1927) (recognizing cause of action where plaintiffs allege "fraud in inducing, not the purchase of the bonds, but their retention after purchase"); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 701092, at *8 (S.D.N.Y. Mar. 29, 2005); *Primavera Familienstiftung v. Askin*, 130 F. Supp.2d 450, 494 (S.D.N.Y. 2001) (collecting cases).

[134] The plaintiff shareholders who invested in Bristol do not assert a breach of contract claim. As defendants do not explain what contractual obligations the tort claims supposedly are premised on, it is unclear how these plaintiffs are "merely seeking to enforce [their] bargain." *See New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 288 (1995). The Court, therefore, considers defendants' argument only insofar as it applies to the Safe Harbor Plaintiffs.

[135] *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 656 (1987); *accord Liberty Mut. Ins. Co. v. York Hunter*, 945 F. Supp. 742, 748-49 (S.D.N.Y. 1996).

created by a contract, as in the case of a lawyer and client.[136]  In addition, "[i]t is well settled that the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself."[137]  Here, the various tort claims and contract claim are based on the same underlying conduct -- i.e., that defendants misrepresented NAVs.  However, the allegations are sufficient to show a relationship of trust and confidence that flows from, but is independent of, the agreement.  As general partner, Safe Harbor Asset Management stood in a fiduciary relationship to the limited partners, including the Safe Harbor Plaintiffs.[138]

Accordingly, defendants' motion to dismiss plaintiffs' claim for common law fraud is granted with respect to misrepresentations occurring prior to April 2002, but otherwise denied.

---

[136]

*E.g.*, *GLM Corp. v. Klein*, 665 F. Supp. 283, 285-86 (S.D.N.Y. 1987) ("[I]f a breach of contract is also a breach of a legal duty independent of the contract, there is extra-contractual wrongdoing, and a fraud action may lie.  This result obtains even if such extracontractual duty is born of the contract itself.") (internal citations omitted); *Rich v. New York Cent. & Hudson River R.R. Co.*, 87 N.Y. 382, 395 (1882) (In cases such as "of lawyer and client, of consignor and factor, the contract establishes a legal relation of trust and confidence; so that upon a breach of the contract there is not merely a broken promise, but, outside of and beyond that, there is trust betrayed and confidence abused.").

[137]

*Mandelblatt v. Devon Stores*, 132 A.D.2d 162, 167-68, 521 N.Y.S.2d 672, 676 (1st Dep't 1987) (citing *Meyers v. Waverly Fabrics*, 65 N.Y.2d 75, 80 n.2, 489 N.Y.S.2d 891, 894 n.2 (1985); *accord Davis v. Dime Sav. Bank, FSB*, 158 A.D.2d 50, 52, 557 N.Y.S.2d 775, 776 (3d Dep't 1990); *see also Rich*, 87 N.Y. at 391 ("[I]t is conceded that a tort may grow out of, or make part of, or be coincident with a contract, and that precisely the same state of facts, between the same parties,  may admit of an action either ex contractu or ex delicto.")

[138]

*See, e.g.*, *Riviera Congress Assocs. v. Yassky*, 18 N.Y.2d 540, 547,  277 N.Y.S.2d 386, 392 (1966) ("There can be no question that a managing or general partner of a limited partnership is bound in a fiduciary relationship with the limited partners.") (citing *Meinhard v. Salmon*, 249 N.Y. 458 (1928)).

2.      Breach of Fiduciary Duty (Claim 3)

Plaintiffs argue that the Beacon Hill Defendants' alleged misrepresentations constituted a breach of fiduciary duty. Defendants argue that the plaintiffs lack standing to sue individually, rather than derivatively, because plaintiffs did not suffer an injury separate and distinct from the injury suffered by the Funds.[139]

New York follows the rule that "[f]or a wrong against a corporation a shareholder has no individual cause of action, though he loses the value of his investment or incurs personal liability in an effort to maintain the solvency of the corporation."[140]  A shareholder "may sue derivatively but not individually" for such wrongs.[141]  By contrast, a shareholder may sue individually "when the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged."[142]  The same rules apply to actions by limited partners against a partnership.[143]

Here, the alleged wrong was a fraud committed on the shareholders and/or limited partners, rather than on the Funds.  Plaintiffs allege that the Beacon Hill Defendants fraudulently

---

[139]

Beacon Hill Defs. Mem. at 30.  The Beacon Hill Defendants do not argue that they did not owe fiduciary duties to the plaintiffs.  *See id.*

[140]

*Abrams v. Donati*, 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782, 783 (1985) ("[A]llegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may sue derivatively but not individually.").

[141]

*Id.*

[142]

*Id.*

[143]

*See, e.g.*, *Broome v. ML Media Opportunity Partners L.P.*, 273 A.D.2d 63, 64, 709 N.Y.S.2d 59, 60 (1st Dep't 2000); *Strain v. Seven Hills Associates*, 75 A.D.2d 360, 370-71, 429 N.Y.S.2d 424, 431-32 (1st Dep't 1980).

overstated the NAVs of the Funds so as to conceal declines in the value of fund assets and that

plaintiffs were injured when they invested or retained their investments in reliance upon the

misstatements.  The underlying losses to the Funds allegedly resulted, at least in part, from a decline

in interest rates rather than by a fraud on the company.  To be sure, some mismanagement and self-

dealing -- which, without more, would be wrongs to the Funds only -- may have been involved.  But

the principal wrong here appears to have been a valuation fraud that injured plaintiffs, not the Funds.

 Accordingly, a direct action is proper.[144]

Defendants further argue that plaintiffs' breach of fiduciary duty claim is preempted

by New York's Martin Act,[145] which makes it unlawful to, among other things, use or employ "any

fraud . . . where engaged in to induce or promote the issuance, distribution, exchange, sale,

negotiation or purchase within or from this state of any securities or commodities . . ."[146]  As the

Second Circuit has explained,

> "The New York Court of Appeals has held that there is no implied private right of
> action under the Martin Act, *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 275,
> 519 N.Y.S.2d 804, 806 (1987), and other New York courts have determined that
> sustaining a cause of action for breach of fiduciary duty in the context of securities
> fraud 'would effectively permit a private action under the Martin Act, which would
> be inconsistent with the Attorney-General's exclusive enforcement powers

---

[144]

 *Cf.*, *Coronado Dev. Corp. v. Millikin*, 175 Misc. 1, 5, 22 N.Y.S.2d 670, 675 (Sup. Ct. N.Y. County 1940) ("[D]epreciation resulting from the dissemination of false information as to corporate assets or business or management, as distinguished from a wrongful withholding or taking or dissipation of corporate property or interference with its business, necessarily constitutes a direct injury to individual stockholders and is a wrong to them rather than to the corporation and may be redressed by suit by individual stockholders suing in their own right.").

[145]

 N.Y. Gen. Bus. Law art. 23-A.

[146]

 *Id.* § 352-c(1)(a).

thereunder.'"[147]

Citing "principles of federalism and respect for state courts' interpretation of their own laws," the Second Circuit in *Castellano* agreed with this rule.[148]

Plaintiffs argue that *Castellano* is no longer sound[149] or, in the alternative, that the Martin Act preempts only claims based on conduct "within or from" New York.[150]  The Court need not address the first argument because it finds the latter persuasive.  Shares in the Funds, plaintiffs argue, were marketed and sold in New Jersey.[151]  Defendants respond by pointing to allegations in the Complaint that misconduct took place in New York, including an allegation that "the Funds'

---

147

    *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) (quoting *Eagle Tenants Corp. v. Fishbein*, 182 A.D.2d 610, 611, 582 N.Y.S.2d 218, 219 (2d Dep't 1992)); *see also Horn v. 440 East 57th Co.*, 151 A.D.2d 112, 120, 547 N.Y.S.2d 1, 5 (1st Dep't 1989).

148

    257 F.3d at 190; *see also, e.g.*, *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2003 WL 22052894, at *3 (S.D.N.Y. Sept. 2, 2003) ("The federal district courts that have examined the question have reached the same result [as the court in *Horn*, 151 A.D.2d 112] with near unanimity.") (collecting cases).

149

    Plaintiffs rely upon *Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2498 (DLC), 2001 WL 1112548, at *4 n.6 (S.D.N.Y. Sept. 19, 2001), in which Judge Cote noted that the Second Circuit in *Castellano* "did not address the split among the New York Appellate Divisions on this issue." In *Cromer*, decided two months after *Castellano*, the court declined to extend the reasoning in *Castellano* to dismiss negligence claims based on preemption by the Martin Act. *Id.* at *4.  It stated that "there is nothing in either . . . [relevant] New York Court of Appeals cases . . . or in the text of the Martin Act itself to indicate an intention to abrogate common law causes of action" and predicted that the Second Circuit would reach a different result when next confronted with the issue. *Id.* at *4 & n.6.

150

    *See Nanopierce Techs.*, 2003 WL 22052894, at *5 (Martin Act does not preempt common law claims where securities at issue were not sold "within or from" New York); *Lehman Bros. Commercial Corp., v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp.2d 159, 165 (S.D.N.Y. 2001) (same).

151

    Pls. Mem. at 55 (citing Cpt. ¶¶ 16 (Beacon Hill was located in New Jersey), 17-20 (principals resided in New Jersey)).

purchase and sale of securities occurred in New York."[152]  The Court construing the Complaint in the light most favorable to plaintiffs, it appears that the conduct was not confined to New York and, indeed, that some plaintiffs may have interacted with defendants exclusively outside of New York.[153]  The Court therefore cannot say that plaintiffs can prove no facts in support of their claim that would entitle them to relief even if defendants' preemption argument is correct.  Accordingly, defendants' motion to dismiss the claim for breach of fiduciary duty is denied.

3.      Negligence and Negligent Misrepresentation (Claim 4)

Plaintiffs' negligence/negligent misrepresentation claim rests on the alleged misrepresentations that underlie its common law fraud claim.  "It is settled New York law that the elements of negligent misrepresentation are: (1) carelessness in imparting words; (2) upon which others were expected to rely; (3) and upon which they did act or failed to act; (4) to their damage."[154]  In addition, the action requires that "(5) the declarant . . . express the words directly, with knowledge or notice that they will be acted upon, to one to whom the declarant is bound by some relation or duty of care."[155]  For the reasons discussed in Section III *supra*, plaintiffs adequately have pled the

---

152

      *See, e.g.*, Cpt. ¶ 31 ("The defendants conducted substantial activities in New York, and their conduct here [in New York] directly caused the plaintiffs' losses.  Among other things: a) the Beacon [Hill] Defendants met with certain plaintiffs in New York to induce these plaintiffs to invest in the Funds; b) the Funds' purchase and sale of securities occurred in New York . . .").

153

      *See, e.g.*, *id.* ¶¶ 109, 146, 191.

154

      *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) (citing *White v. Guarente*, 43 N.Y.2d 356, 363, 401 N.Y.S.2d 474, 478 (1977)).

155

      *Id.* (citing *White*, 43 N.Y.2d at 363, 401 N.Y.S.2d at 478).

first four elements.

The Beacon Hill Defendants argue unpersuasively that the allegations are insufficient to show a "special relationship" giving rise to a duty to speak with care. "In the commercial context, a duty to speak with care exists when 'the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information'" and the reliance is justifiable.[156] The duty to speak with care is imposed "only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified."[157] In *Kimmell v. Schaefer*,[158] the New York Court of Appeals held that a fact finder determining whether justifiable reliance exists "should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose."[159] The Second Circuit has stated that a "'sparsely pled' special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where 'the complaint emphatically alleges the other two factors

---

[156] *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 719 (1996).

[157] *Id.*

[158] 89 N.Y.2d 257, 652 N.Y.S.2d 715.

[159] *Id.* at 264, 652 N.Y.S.2d at 719.

enunciated in *Kimmell*.'"[160]

To determine whether defendants had a relationship with plaintiffs that justified plaintiffs' reliance on defendants' valuations, it is useful to separate the plaintiffs into two groups -- those who relied upon the misrepresentations prior to their first investment in the Funds and those who were shareholders and/or limited partners at the time they relied upon the misrepresentations. The allegations are more than sufficient to show justifiable reliance with respect to both groups, but on different theories. The first-time investors justifiably relied on the Beacon Hill Defendants to publish accurate information about the Funds they managed. These defendants, after all, allegedly managed and determined the composition of the Funds and therefore were uniquely positioned to know their overall value. The Individual Defendants were particularly situated to know the values of the Funds because they were sole principals and directors of Beacon Hill. Moreover, the Beacon Hill Defendants allegedly sent MPRs to prospective investors in order to induce them to invest and therefore should have known that plaintiffs would rely upon this information in deciding whether to invest. Plaintiffs who held investments in the funds when inaccurate statements were made also justifiably relied upon the statements for these reasons, but for another as well. As shareholders and/or limited partners, their relationships with the Individual Defendants were fiduciary in nature.

---

[160]

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 188 (2d Cir. 2004) (quoting *Suez Equity Investors*, 250 F.3d at 103).

4.      Breach of Contract Against Safe Harbor Asset Management (Claim 33)

The Safe Harbor Plaintiffs allege that Safe Harbor Asset Management breached the parties' Safe Harbor Limited Partnership Agreement by "misrepresenting that Safe Harbor's portfolio would be marked in good faith, at fair value, using models and marks received from broker-dealers, when instead, the marks used were artificially inflated."[161]  For the reasons explained in Section III *supra*, the Safe Harbor Plaintiffs adequately have pleaded that Safe Harbor Asset Management did not value Safe Harbor's portfolio in good faith.  Accordingly, the motion to dismiss this claim is denied.

5.      Punitive Damages

The Beacon Hill Defendants further contend that plaintiffs' requests for punitive damages, which are made in connection with various of their state law claims, must be dismissed because plaintiffs have alleged "mere fraud."[162]  "Under New York law, punitive damages are appropriate in cases involving gross, wanton, or willful fraud or other morally culpable conduct. Such conduct need not be directed at the general public."[163]  Here, the allegations are sufficient to permit an inference of gross, wanton, willful, or morally culpable conduct on the part of the Beacon

---

[161]    Cpt. ¶ 489.

[162]    Beacon Hill Defs. Mem. at 35.

[163]    *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 509 (2d Cir. 1991) (internal citations and quotation marks omitted); *accord Campagnola v. Mulholland*, 76 N.Y.2d 38, 48, 556 N.Y.S.2d 239, 245 (1990) ("[P]unitive damages are allowable only when the high threshold of moral culpability is satisfied, cases involving gross or wanton negligence or willful, malicious conduct.").

Hill Defendants. Plaintiffs have pled with particularity that the Beacon Hill Defendants breached their fiduciary duties by reporting fraudulent NAVs. They allege that three Individual Defendants did so while at the same time engaging in self-dealing transactions that minimized their own personal losses; they allege conscious misbehavior or recklessness on the part of the fourth Individual Defendant.[164]

B.    *Claims Against Asset Alliance*

    1.    Aiding and Abetting Fraud and Aiding and Abetting Breach of Fiduciary Duty (Claims 13 and 14)

        To state a claim for aiding and abetting liability, plaintiffs must allege "actual knowledge" by the aider and abettor of the primary violation.[165] Allegations of constructive knowledge or recklessness are insufficient.[166]

        Plaintiffs rely upon the following factual allegations to show *scienter*: that Asset Alliance represented to investors that it reviewed Beacon Hill's prices to ensure their consistency with market values; that it was vested generally with "management and control" of Beacon Hill; that

---

[164]

    *See Trudeau v. Cooke*, 2 A.D.3d 1133, 1134, 769 N.Y.S.2d 322, 323 (3d Dep't 2003) ("While intentional conduct is not a mandatory showing for punitive damages, the conduct generally must be so reckless or wantonly negligent as to be the equivalent of a conscious disregard of the rights of others.") (internal quotation marks omitted).

[165]

    *E.g.*, *In Re Sharp Int'l Corp. & Sharp Sales Corp.*, 403 F.3d 43, 49 (2d Cir. 2005) (aiding and abetting breach of fiduciary duty) (citing *Kaufman v. Cohen*, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dep't 2003)); *Filler v. Hanvit Bank*, 339 F. Supp.2d 553, 557 (S.D.N.Y. 2004) (aiding and abetting fraud) (citing *Steed Fin. LDC v. LASER Advisers, Inc.*, 258 F. Supp.2d 272, 282 (S.D.N.Y. 2003)).

[166]

    *See, e.g.*, *Cromer Fin.*, 137 F. Supp.2d at 495 n.28; *Williams v. Bank Leumi Trust Co.*, No. 96 Civ. 6695 (LMM), 1997 WL 289865 (LMM), at *5 (S.D.N.Y. May 30, 1997).

it had the authority to require Beacon Hill to comply with applicable laws; that it performed risk management services for Beacon Hill; that it conversed with the Individual Defendants; and that it knew about Beacon Hill's fiduciary obligations to investors.[167]  These allegations do not permit an inference that Asset Alliance had actual knowledge of the alleged fraud.

Accordingly, the aiding and abetting claims against Asset Alliance are dismissed.

2.      Breach of Contract (Claim 20 – by Sanpaolo)

Asset Alliance allegedly entered into an agreement ("Advisory Agreement") with Sanpaolo to provide that company with investment advisory services.  Sanpaolo alleges that Asset Alliance breached Section 3(b) of the agreement, which required Asset Alliance to "monitor the status and performance of [Beacon Hill and Bristol] at least once a month, and [to] promptly inform Sanpaolo if, for any reason, it believes that [Beacon Hill or Bristol] should be de-selected."[168]  Asset Alliance allegedly provided Sanpaolo with a due diligence report stating that Asset Alliance "ensure[d] that [Beacon Hill's] marks are consistent with market values."[169]  It allegedly breached the Advisory Agreement because it "knew, or should have known" that Beacon Hill overstated the value of Bristol's portfolio but failed to inform Sanpaolo.[170]  Plaintiff has stated a sufficient claim for breach of contract.

---

[167]     *See* Section IV *supra*; Pls. Mem. at 66-67.

[168]     Cpt. ¶ 374.

[169]     *Id.* ¶ 185.

[170]     *Id.* ¶ 375.

Asset Alliance argues that it "had no obligation to conduct an independent investigation of the reports it received from the Beacon [Hill] Defendants."[171]  The case it relies upon, however, is distinguishable.  *Gabriel Capital, L.P. v. NatWest Finance, Incorporated*,[172] addressed, in the context of determining liability under federal securities laws,  whether  an investment advisor has a duty to investigate the accuracy of statements made in an offering memorandum not prepared by itself and which its client relies upon in making an investment.  The court declined to impose such a duty "when there is nothing that is obviously suspicious about those statements."[173]  Here, plaintiffs' claim is based not on a general duty owed by investment advisors but instead on a particular contractual duty to "monitor the status and performance" of the funds.  As it cannot now be said that Asset Alliance discharged that duty, dismissal at this time is inappropriate.[174]

---

[171]
Asset Alliance Mem. at 28.

[172]
137 F. Supp.2d 251 (S.D.N.Y. 2000).

[173]
*Id.* at 262.

[174]
Asset Alliance further argues that other provisions of the Advisory Agreement made clear that  its obligation merely was to provide Sanpaolo with data, which, in defendant's words, Sanpaolo "ultimately was obligated to evaluate for itself."  This interpretation of the agreement is unpersuasive, as it effectively ignores Asset Alliance's obligations under Section 3(b).  The fact that one provision may have required Asset Alliance to provide data does not, without more, extinguish the obligations under Section 3(b).

3.      Breach of Fiduciary Duty (Claim 21 – by Sanpaolo)

Sanpaolo asserts that Asset Alliance, as its investment advisor, owed it fiduciary duties that it allegedly breached by "fail[ing] to monitor the performance of Bristol and . . . prevent Defendants' fraudulent conduct."[175]  Asset Alliance argues that the claim must fail because it is duplicative of the breach of contract claim.  This argument fails because Asset Alliance owed a duty to plaintiff Sanpaolo independent of the contract.

"A fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity on another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another."[176]  Whether a relationship is fiduciary in nature must be determined on the basis of the services agreed to by the parties.[177]

The allegations here show that Sanpaolo justifiably reposed trust and confidence in Asset Alliance and relied upon its superior knowledge.  Asset Alliance allegedly was plaintiff's investment advisor and committed to "monitor the status and performance of [Beacon Hill and Bristol] at least once a month and [to] promptly inform Sanpaolo if, for any reason, it believes that [Beacon Hill or Bristol] should be de-selected."[178]  It allegedly made numerous other assurances about its ability to monitor and review the performance of its affiliates.  For example, it allegedly

---

[175]

Cpt. ¶ 382.

[176]

*Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995) (citing *Teachers Ins. & Annuity Ass'n of Am. v. Wometco Enters., Inc.*, 833 F. Supp. 344, 349-50 (S.D.N.Y. 1993)).

[177]

*Northeast Gen. Corp. v. Wellington Adver.*, 82 N.Y.2d 158, 163, 604 N.Y.S.2d 1, 4 (1993).

[178]

Cpt. ¶ 374.

represented that it "had the ability to track, analyze, and report the results of each affiliate manager's funds and investment products on a daily basis"; that it "monitored its affiliates to insure [*sic*] that they maintained their stated investment guidelines and strategies"; that it "analyzed and monitored its affiliates' portfolios and specialized investment products on a daily basis"; that it "had full transparency of the positions of the funds";[179] that it "monitor[ed] and review[ed] Beacon Hill's portfolio risks";[180] and that it "ensure[d] [Beacon Hill's] marks [were] consistent with market values."[181]  These allegations are sufficient to plead a fiduciary relationship.[182]

Asset Alliance further argues that the claim must fail because the Complaint fails to plead "deceitful intent," which it asserts is an element of a breach of fiduciary claim.  The sole authority it relies upon for this proposition is *Flickinger v. Harold C. Brown & Company*,[183] in which

---

[179]

  *Id.* ¶ 184.

[180]

  *Id.* ¶ 185.

[181]

  *Id.*

[182]

  Other courts also have recognized fiduciary relationships between clients and their investment advisors. *See, e.g., Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp.2d 79, 102 (S.D.N.Y. 2004) (collecting cases); *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688 (WHP), 2002 WL 362794, at *9 (S.D.N.Y. Mar. 6, 2002) (collecting cases); *Rasmussen v. A.C.T. Envtl. Servs.*, 292 A.D.2d 710, 712, 739 N.Y.S.2d 220, 222 (3d Dep't 2002) (an investment advisor "[holds] a position of trust and owe[s] [its client] a fiduciary duty"); *see also Mandelblatt*, 132 A.D.2d at 168, 521 N.Y.S.2d at 676 (fiduciary relationship arises where one person "is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation").  In addition, "New York law . . . does not . . . make the presence of a fiduciary duty between a bank and its client contingent on a formal agency relationship of some kind."  *Am. Tissue*, 351 F. Supp.2d at 102.

[183]

  947 F.2d 595, 599 (2d Cir. 1991).

the Second Circuit stated that under New York law "[a]n action for breach fiduciary duty [] requires a showing of 'deceitful intent' on the part of the fiduciary."[184]  The only authority *Flickinger* cites for that statement is *Horn v. 440 East 57th Company*.[185]  *Horn*, however, stated the opposite.[186]  The *Horn* court addressed whether New York's Martin Act preempts negligent misrepresentation and breach of fiduciary claims.[187]  It noted that "[f]airly construed, both these causes of action *omit the element of a deceitful intent* on defendant's part and substitute therefor the existence of a fiduciary relationship of trust and confidence."[188]  As the Martin Act also does not require proof of deceitful intent, the court concluded that "to sustain [these claims] would be, in effect, to recognize a private right of action under the Martin Act contrary to case law."[189]  These cases, therefore, are not

---

[184]

Accord *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537 (MBM), 2003 WL 23018888, at *17 (S.D.N.Y. Dec. 22, 2003) (citing *Flickinger*, 947 F.2d at 599).

[185]

151 A.D.2d 112, 120, 547 N.Y.S.2d 1, 5 (1989).

[186]

*E.g.*, *Highlands Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 27 F.3d 1027, 1032-33 (5th Cir. 1994) (rejecting *Flickinger's* interpretation of *Horn* as requiring "deceitful intent").

[187]

*Horn*, 151 A.D.2d at 120, 547 N.Y.S.2d at 5 (1989); *see* discussion Section V(A)(2) *supra*.

[188]

*Horn*, 151 A.D.2d at 120, 547 N.Y.S.2d at 5 (emphasis added).

[189]

*Id.*; *accord Nanopierce Techs.*, 2003 WL 22052894, at *4 ("[Negligent misrepresentation and breach of fiduciary claims] . . . like the Martin Act itself, do not require proof of deceitful intent; common law fraud, however, does.  Courts concerned with preserving the Attorney General's exclusive domain therefore preclude claims which essentially mimic the Martin Act, but permit common law fraud claims, which require an additional element."); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp.2d 275, 291-92 (S.D.N.Y. 1998) ("The Martin Act . . . does not require proof of intent to defraud or scienter. As a result, claims for breach of fiduciary duty and negligent and innocent misrepresentation, for example, which do not require a plaintiff to plead and prove intentional deceit, are covered by the Martin Act and cannot be asserted by private litigants."); *see also Eagle Tenants*, 182 A.D.2d at 611, 582 N.Y.S.2d at 219 (claim for constructive fraud barred by Martin Act

persuasive authority for the proposition that deceitful intent is an element of a breach of fiduciary claim. Moreover, courts have recognized that breach of fiduciary claims may be premised on theories of negligence.[190] It is unnecessary for the Court to identify at this time the precise standard of care owed inasmuch as plaintiffs adequately have alleged that Asset Alliance either should have known or recklessly disregarded the alleged fraud.

Finally, Asset Alliance argues that its duties did not include a duty to investigate the accuracy of Beacon Hill's data. It relies upon *Gabriel Capital, L.P. v. NatWest Finance, Incorporated*,[191] discussed in Section V(B)(2) *supra*. That case, however, is distinguishable. In *Gabriel*, the court held that an investment advisor does not have a duty to independently investigate the accuracy of documents that it relies upon in advising its clients.[192] Here, however, Asset Alliance allegedly represented to Sanpaolo that it "ensure[d] that the portfolios' marks are consistent with market values."[193] By making this representation, Asset Alliance took on a duty to review and check

---

because it does not require proof of deceitful intent).

[190]

See, e.g., *Napoli, Kaiser & Bern, LLP v. Westport Ins. Corp.*, 295 F. Supp.2d 335, 340 (S.D.N.Y. 2003); *Hotel Des Artistes, Inc. v. Transamerica Ins. Co.*, No. 93 Civ. 4563 (SS), 1994 WL 263429, at *5 & n.5 (S.D.N.Y. June 13, 1994).

[191]

137 F. Supp.2d 251.

[192]

*Id.* at 263 ("An investment advisor is retained to suggest appropriate investments for its clients, but is not required to assume the role of accountant or private investigator and conduct a thorough investigation of the accuracy of the facts contained in the documents that it analyzes for the purpose of recommending an investment.").

[193]

Cpt. ¶ 185; *see also id.* ¶ 188 (alleging that, during a meeting at the Asset Alliance offices, the head of its risk management department showed a Sanpaolo representative how Asset Alliance had the ability to analyze and monitor the Bristol portfolio by connecting to Bear Stearns' computer system).

Beacon Hill's prices.

Accordingly, the motion to dismiss Sanpaolo's breach of fiduciary claim is denied.

## VI.  Conclusion

The Beacon Hill Defendants' motion to dismiss [docket item 53] is disposed of as follows:

1.    The motion is granted insofar as:

(a)    claims based on misrepresentations made prior to April 2002 relating to net asset value and promises to value the funds in good faith are dismissed for failure to plead fraud with particularity;

(b)    claims based on misstatements and omissions, other than claims based on statements made in the May and June 2002 due diligence questionnaires, concerning defendants' use of independent marks are dismissed for failure to plead fraud with particularity;

(c)    state law claims by plaintiffs who do not assert a federal securities claim against the Beacon Hill Defendants are dismissed for lack of subject matter jurisdiction.

2.    The motion is otherwise denied.

The motion by Asset Alliance [docket item 58] to dismiss is granted to the extent that the aiding and abetting claims, as well the other claims insofar as they are based on misstatements and omissions made prior to April 2002, are dismissed.  It is otherwise denied.

SO ORDERED.

Dated: July 5, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)