UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FRATERNITY FUND LTD., et al.,

                Plaintiffs,

     -against-                                                 03 Civ. 2387 (LAK)

BEACON HILL ASSET MANAGEMENT LLC, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

LEWIS A. KAPLAN, *District Judge.*

        The case is before the Court on motions by defendants ATC Fund Services (Cayman) Limited ("ATC") and Amsterdam Trust Corp., B.V. ("ATC BV") (collectively the "ATC Defendants") to dismiss the amended complaint ("Complaint").

*Facts*

        At the center of this case is an alleged valuation fraud involving hedge funds that invested in mortgage-backed and related securities.[1] The two funds at issue here are Bristol Fund, Ltd. ("Bristol") and Safe Harbor, L.P. ("Safe Harbor") (collectively the "Funds"). They were created and managed by defendants Beacon Hill Asset Management, LLC ("Beacon Hill"), Safe Harbor

---

[1] Cpt. ¶¶ 1-5. A more detailed description of the Complaint is set forth in *Fraternity Fund Ltd. et al. v. Beacon Hill Asset Mgmt. LLC*, No. 03 Civ. 2387 (LAK), 2005 U.S. Dist. LEXIS 13094 (S.D.N.Y. July 6, 2005) (the "July 6 Opinion"). The Court there granted in part the motions to dismiss by defendants Beacon Hill Asset Management, LLC, Safe Harbor Asset Management, LLC, John D. Barry, Thomas Daniels, John Irwin, Mark Miszkiewicz and Asset Alliance Corp.

Asset Management, LLC ("Safe Harbor Asset Management"), and their four principals, defendants John D. Barry, Thomas Daniels, John Irwin, and Mark Miszkiewicz (collectively, the "Beacon Hill Defendants").[2] ATC was the administrator of the Funds.[3]

From March 2000 through September 2002, the Beacon Hill Defendants allegedly misrepresented in offering memoranda and elsewhere that the Funds' net asset values ("NAVs") would be calculated in good faith using independent prices.[4] Contrary to those representations, they allegedly overpriced the securities in the Funds' portfolios for purposes of reporting NAVs in audited financial statements and month-end reports.[5]

ATC allegedly is liable on the theory that it calculated the Funds' NAVs using the Beacon Hill Defendants' inflated prices without verifying the accuracy of those prices.[6] It then disseminated the NAVs to plaintiffs in month-end reports.[7] Plaintiffs assert that Beacon Hill's prime broker, Bear Stearns, independently valued the securities in the Funds' portfolios and arrived at prices that would have resulted in portfolio valuations that were lower than those based upon the

---

[2] Cpt. ¶ 1.

[3] *Id.* ¶ 73.

[4] *Id.* ¶¶ 42-50.

[5] *Id.* ¶¶ 56, 103.

[6] *Id.* ¶¶ 73-78.

[7] *Id.*

Beacon Hill prices.[8] Although ATC allegedly received the Bear Stearns prices, it "slavishly used the Beacon [Hill] Defendants' marks . . . without verifying that the marks reflected market value."[9]

The Complaint asserts claims against ATC under Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"),[10] and Rule 10b-5 thereunder,[11] and on state law theories.[12] It makes a claim against ATC BV for control person liability under Section 20(a) of the Exchange Act.[13]

The ATC Defendants move to dismiss on various grounds, including, primarily, that the Complaint fails to satisfy Fed. R. Civ. P. 9(b) and/or the Private Securities Litigation Reform Act ("PSLRA").[14]

---

[8] *Id.* ¶ 6.

[9] *Id.* ¶ 77.

[10] 15 U.S.C. § 78a *et seq.*

[11] 17 C.F.R. § 240.10b-5.

[12] *See* Cpt. claims 5, 7-11, 25-27.

[13] 15 U.S.C. § 78t(a).

[14] 15 U.S.C. § 78u-4(b).

*Discussion*

In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.[15] A district court may consider the full text of documents attached as exhibits to the complaint, incorporated in it by reference, or "integral" to the complaint.[16]

*A.*     Scienter

Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."[17] This may be done "either (a) by alleging facts that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[18] "[T]he inference may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3)

---

[15] *Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 143 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002).

[16] *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). The Court considers the text of various documents attached to or referenced by the Complaint, such as the Funds' offering memoranda. The Court considers also the agreements between ATC and the Funds. Although these documents are not referenced in the numbered paragraphs of the Complaint, plaintiffs' reliance upon their terms and effect renders them integral to the Complaint.

[17] 15 U.S.C. § 78u-4(b)(2).

[18] *Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir. 1995) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor."[19]

Plaintiffs rely upon the conscious misbehavior or recklessness approach.[20] They contend that "ATC knew facts or had access to information suggesting that their public statements and those of the Beacon Defendants were not accurate."[21] In particular, they allege that ATC routinely received prices of the securities in the Funds' portfolios from Bear Stearns and that those prices would have resulted in portfolio valuations that were lower than the valuations published by the Beacon Hill Defendants.[22] Valuations based on Bear Stearns prices would have been lower than those based on Beacon Hill prices by 10 to 15 percent in March 2000 and March 2001, 16.32 percent in March 2002, 24.46 percent in April 2002, 12.45 percent in May 2002, 15.08 percent in June 2002, 31.43 percent in July 2002, and 37.62 percent in August 2002.[23] ATC allegedly stated in a due diligence questionnaire for Bristol that it received "position statements" from Bear Stearns, as well as from the fund's managers, and that non-public securities were valued "from the Prime Brokers, and underwriters; and verified with Bloomberg."[24]

---

[19] *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

[20] *See* Pls. Mem. in Opp. to ATC Motion at 82.

[21] *Id.*

[22] Cpt. ¶¶ 6, 75.

[23] *Id.* ¶ 6.

[24] *Id.* ¶ 75; *see also id.* Ex. I.

Plaintiffs have not alleged facts sufficient to justify their assertion that the Bear Stearns/Beacon Hill valuation disparity created a red flag. As explained in the July 6 Opinion, "[t]he defendants' hedge funds involved non-exchange listed securities, the valuation of which may differ depending on the model used in the calculations. In other words, valuation of such securities was not a matter of looking up closing prices in the *Wall Street Journal*, but involved the exercise of judgment."[25] Plaintiffs do not allege that the models used or the judgments made by Bear Stearns were superior to those used or made by Beacon Hill. They do not allege that the differences in valuations were outside the range of what was considered normal in the industry. Certainly they do not allege that the ATC Defendants had any reason to think that Bear Stearns figures were any better than those of the Beacon Hill Defendants.[26]

Plaintiffs' theory of *scienter* appears to be based also upon the mistaken assumption that ATC had the expertise or duty "to conduct an independent valuation" of the securities in the Funds' portfolios.[27] Although ATC allegedly was responsible for computing the NAV of the Funds,

---

[25] *See Beacon Hill*, 2005 U.S. Dist. LEXIS 13094, at *21-22; *see also* Cpt. ¶ 86 ("Shares of the Funds were not publicly traded. Hence, no independently verified third-party information about the Funds or their performance was available to investors or prospective investors in the Funds other than . . . audit reports and the audited financial statements.").

[26] The case that plaintiffs rely upon, *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001), is distinguishable. The court there held that plaintiffs adequately pleaded *scienter* against the administrators of an investment fund who allegedly knowingly and/or recklessly used false data from the fund's manager to calculate NAV despite having received contrary information from Bear Stearns. *Id.* at 481. The NAV allegedly was overstated by $400 million. *Id.* at 464. The critical difference is that the fund there at issue held securities listed on major securities exchanges, and its NAV was based upon the prices listed on the exchanges. *See id.* at 462. Thus, the securities in question had objectively ascertainable fair market values.

[27] *See* Cpt. ¶ 77.

that task is different from the task of valuing the securities in the Funds' portfolios.[28] Fund documents delegated responsibility for the former task to ATC and the latter to Bristol's investment manager and Safe Harbor's general partner.

One such document was the Bristol offering memorandum. It repeatedly stated that the fund's investment manager, Beacon Hill, was responsible for valuing the fund's securities and cautioned that this delegation of responsibility to the investment manager created a potential conflict of interest insofar as the investment manager's compensation was based upon NAV.[29] In contrast, when describing ATC's responsibilities as administrator, the offering memorandum nowhere indicated that one of ATC's responsibilities was the valuation of the securities in the fund.[30] Instead,

---

[28] The Funds' offering memoranda defined NAV as "equivalent to [the fund's] gross assets less it gross liabilities." 1997 Bristol Offering Mem. at 34; 1997 Safe Harbor Offering Mem. at 33. The gross assets of the Funds included not only the value of securities held by the Funds, but other assets as well, such as cash and accounts receivable. Bristol Articles of Association at 13; Safe Harbor Limited Partnership Agreement at 5.

[29] *See, e.g.*, 1997 Bristol Offering Mem. at 28 ("The Board of Directors has delegated to the Investment Manager [i.e., Beacon Hill Asset Management] the responsibility for valuing the Fund's securities and other assets. Since the Investment Manager's compensation is based on the Fund's Net Asset Value, including the payment of Incentive Fees based upon the increase in Net Asset Value, the Investment Manager faces a conflict in establishing such values . . . . The Investment Manager will independently value the Fund's securities based upon certain models and the prices quoted for similar securities."); *id.* at 34 (stating, in section titled "Determination of Net Asset Value," that "the Investment Manager will value the Securities of the Fund in accordance with the Fund's Articles of Association").

[30] *See id.* at 32-33 (section titled "The Administrator"). Similarly, Bristol's amended offering memorandum, dated June 2002, repeatedly stated that the investment manager was responsible for valuing the securities in the fund and further stated that the administrator was responsible for computing NAV. *See* 2002 Bristol Offering Mem. at 22 ("The Investment Manager, in its sole and absolute discretion, values the assets of the Fund in accordance with the Investment Management Agreement."); *id.* at 35 ("The Administrator is responsible for, among other things . . . computing and disseminating the Net Asset Value of the Fund's Shares . . .").

it cited to the administration agreement between ATC and the Fund, which lists one of ATC's "duties and functions" as including responsibility for "computing the Net Asset Value of the Company's shares . . . ."[31] Safe Harbor's offering memoranda also provided that the general partner, Safe Harbor Asset Management, was responsible for valuing the securities in the fund's portfolio, whereas its administration agreement with ATC provided that the latter was responsible for computing the partnership's NAV.[32] Plaintiffs do not allege facts to show that, contrary to these documents, ATC had an obligation to independently calculate or verify the Beacon Hill prices.[33]

---

[31]

    *See* Bristol-ATC Administration Agreement § 1.1.

[32]

    *See, e.g.*, 1997 Safe Harbor Offering Mem. at 28 (stating, in section titled "Potential Conflicts of Interest," that "[s]ome of the Securities or positions may not be traded on an exchange, or may be thinly traded, making valuation and the determination of the resulting gain or loss subject to the General Partner's judgment."); *id.* at 33 (stating, in section titled "Valuation of Assets," that "[t]he General Partner will value the Securities held by the Partnership"); 2002 Safe Harbor Offering Mem. at 23 (stating, in section titled "Partnership Risks," that "[t]he General Partner, in its sole and absolute discretion, values the assets of the Partnership in accordance with the Partnership Agreement."); *id.* at 37 (stating, in section titled "Valuation of Assets," that "[t]he General Partner will value the Securities held by the Partnership"); Safe Harbor-ATC Administration Agreement § 1.1.

[33]

    For these reasons, plaintiffs' alleged reliance upon ATC "to perform[] an independent calculation or otherwise verify[] the value of these portfolios," *see* Cpt. ¶ 253, was unreasonable as a matter of law. Plaintiffs were sophisticated investors who invested at least $100,000 (and, in most cases, more than $1 million) in the Funds. *See id.* ¶ 15. In addition, the Funds' governing documents required investors to represent that they had knowledge and experience in financial matters and were capable of understanding the risks of their investments. *See, e.g.*, 1997 Bristol Offering Mem. at iv; 1997 Safe Harbor Offering Mem. at 10. Given plaintiffs' sophistication and the fact that the offering memoranda clearly stated that the investment manager or general partner would value the securities in the Funds, plaintiffs' alleged reliance upon ATC to calculate independently or otherwise verify the value of the portfolios was unreasonable as a matter of law. *Cf. Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195-96 (2d Cir. 2003) (plaintiff's reliance upon representations that were not reflected in a contract was unreasonable as a matter of law given the "extensive contractual representations about other matters, [plaintiff's] sophistication, and the size of the transaction").

Accordingly, plaintiffs fail to plead facts giving rise to a strong inference of *scienter*.

B.   *Control Person Liability*

The Complaint alleges control person liability against ATC BV based on the alleged primary violation by ATC. As plaintiff has failed adequately to allege a primary violation, its Section 20(a) claims are dismissed.[34]

C.   *State Law Claims*

Plaintiffs allege various state law claims against ATC. However, for the reasons addressed in the July 6 Opinion, the Court lacks supplemental jurisdiction over those claims.[35]

*Conclusion*

As the Complaint fails to satisfy either the PSLRA or Rule 9(b) as to the moving defendants, the Court does not address defendants' remaining arguments for dismissal of the federal securities law claims. The motions of defendants ATC Fund Services (Cayman) Limited and

---

[34] *See Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004) (where primary securities claims are dismissed, control person claims predicated on those claims must also be dismissed).

[35] *See Beacon Hill*, 2005 U.S. Dist. LEXIS 13094, at *53 n.128.

Amsterdam Trust Corp., B.V. to dismiss the federal securities law claims [docket items 50 and 71, respectively] are granted. As plaintiffs already have had an opportunity to amend, dismissal is with prejudice.[36] There being no independent basis of federal jurisdiction over the state law claims, they are dismissed for lack of subject matter jurisdiction.

SO ORDERED.

Dated: July 11, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[36] *See Alteram S.A. v. Beacon Hill Asset Management, LLC.*, No. 03 Civ. 2387(LAK), 2004 WL 367709 (S.D.N.Y. Feb. 27, 2004).