UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FRATERNITY FUND LTD, et al.,

       Plaintiffs,

   -against-           03 Civ. 2387 (LAK)

BEACON HILL ASSET MANAGEMENT, LLC, et al.,

       Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OPINION**

   Appearances:

        Scott M. Berman
        Robert S. Loigman
        Heather J. Windt
        Lee D. Vartan
        FREIDMAN KAPLAN SEILER & ADELMAN LLP
        *Attorneys for Plaintiffs*

        Steven Wolowitz
        Henninger S. Bullock
        Andrew J. Calica
        MAYER BROWN ROWE & MAW LLP
        *Attorneys for Defendant Banc of America Securities LLC*

        Joel M. Miller
        Claire L. Huene
        MILLER & WRUBEL PC
        *Attorneys for Defendants Prudential Financial, Inc., Prudential Equity Group, LLC, and Wachovia Securities, LLC*

2

Lᴇᴡɪꜱ A. Kᴀᴘʟᴀɴ, *District Judge.*

Investors in several hedge funds bring this action against the funds' managers and certain financial institutions for participating in an alleged fraud. Banc of America Securities, LLC ("BAS") and Prudential Financial, Inc., Prudential Equity Group, LLC, and Wachovia Securities, LLC (collectively "Prudential") are charged with aiding and abetting fraud and breach of fiduciary duty by the funds' managers. They move to dismiss the complaint as to them.

*Facts*

I.      *The Funds*

Plaintiffs are investors in Bristol Fund, Ltd. ("Bristol"), Safe Harbor Fund, LP ("Safe Harbor"), and/or Milestone Plus Partners, LP ("Milestone") (collectively, the "Funds"),[1] hedge funds that invested primarily in mortgage-backed and related securities.[2] The Funds were managed directly or indirectly by Beacon Hill Asset Management, LLC ("Beacon Hill")[3] and its four principals, John Barry, Thomas Daniels, John Irwin, and Mark Miszkiewicz (together with Beacon Hill, the "Beacon Hill Defendants").[4] In 2002, the Funds became "feeder funds" into a master fund managed by

---

[1]      Cpt. ¶¶ 1, 14. "Cpt." refers to the second amended complaint (docket item 132).

One of the plaintiffs sues as the alleged assignee of an investor. *See id.* ¶ 14(oo).

[2]      *Id.* ¶¶ 26-28, 32-34, 48.

[3]      *Id.* ¶¶ 1, 15.

[4]      *Id.* ¶¶ 1, 16-19.

Beacon Hill (the "Master Fund").[5]


## II.    The Alleged Fraud

The Funds consisted of portfolios of investments including collateralized mortgage obligations ("CMOs") and, it appears, short positions in U.S. treasury securities.[6] The stated approach was to hedge the positions in CMOs, mostly by shorting U.S. treasury bonds in an effort to achieve a low risk, stable return that would be sheltered, at least to a significant extent, from fluctuations attributable to interest rate movements.[7]

The Beacon Hill Defendants reported the Funds' net asset values ("NAVs") to investors each month and provided annual audited financial statements.[8] They allegedly represented also in communications to investors that the NAVs had been or would be calculated in good faith using independent prices.[9] Plaintiffs claim that they relied on these statements when making or retaining investments in the Funds.[10]

According to the second amended complaint (the "SAC"), these statements were

---

[5]

     *Id.* ¶ 35.

[6]

     *See id.* ¶¶ 4-5, 48, 100, 114.

[7]

     *Id.* ¶ 48.

[8]

     *Id.* ¶ 4, 150-291.

[9]

     *Id.* ¶¶ 38-46.

[10]

     *Id.* ¶ 150.

4

fraudulent. The Beacon Hill Defendants allegedly overstated the Funds' NAVs by using phony prices for individual securities in the Funds' portfolios in order to create the false appearance of steadily rising values.[11] Rather than using independent prices, the Beacon Hill Defendants allegedly used their own fraudulent valuations.[12]

      *A.*     *Valuation*

      Plaintiffs allege that from March 2000 through the fall of 2002, the Beacon Hill Defendants misrepresented the Funds' NAVs in order to make it appear as though "each Funds' [*sic*] NAV was steadily increasing with little volatility and virtually no negative months . . . . [when] [i]n fact the Funds were losing money."[13] They allegedly did so primarily by means of a two step process relating to the valuation of the funds' CMOs.

      The first step involved calculating a so-called "hedge-adjusted" NAV for a fund by determining the gain or loss in a fund's short U.S. treasury hedge position and then "plug[ging] the change in value in the treasury position into a computer spreadsheet [the 'Hedge Alloc Spreadsheet'] that allocated value changes to the portfolio's CMOs that matched, in the opposite direction, any loss or gain in the short U.S. treasury position."[14] These calculated CMO values therefore increased in response to any decline in the value of the short treasury position and decreased in response to any

---

[11]     *Id.* ¶ 4.

[12]     *E.g.*, *id.* ¶¶ 65-99.

[13]     *Id.* ¶ 4.

[14]     *Id.* ¶ 48; *see id.* ¶ 100.

gain.[15] In fact, plaintiffs allege, the values thus determined for individual CMOs did not necessarily reflect their market values.[16]

The second step involved manual adjustments to the values of individual CMOs, allegedly to maintain the appearance that the Funds' portfolios steadily increased in value over time.[17]

B.   *The Audits*

The Funds were audited on an annual basis by Ernst & Young Cayman Islands and Ernst & Young LLP (collectively, "E&Y"). Before the creation of the Master Fund in early 2002, Bristol was audited following the conclusion of years ending March 31, while Milestone and Safe Harbor were audited following the conclusion of calendar years. After the creation of the Master

---

[15]   Parenthetically, it is worth noting that the SAC, despite the quoted language, is not clear as to whether plaintiffs contend that the short treasury position was of a composition and size as to eliminate all sensitivity to interest rate movements, which seems quite improbable. *Compare* ¶¶ 48, 100 (suggesting that Hedge Alloc Spreadsheet-calculated movements in value of CMO portfolios were equal to and opposite to actual changes in values of short treasury positions) *with* ¶ 4 (asserting that losses in summer 2002 were exacerbated by accumulation of "a significant short position in U.S. Treasuries on a highly leveraged basis – apparently betting on an increase in interest rates"). More likely, they contend that the Beacon Hill Defendants used the proportionate movement in the value of short treasury positions, which were not complete hedges, as a proxy to compute an assumed movement in the value of the long CMO positions and then allocated that assumed movement among individual CMOs by means of the Hedge Alloc Spreadsheet. This uncertainty in the pleading, although troublesome, is not material for purposes of these motions.

[16]   *Id.* ¶¶ 48-49.

[17]   *Id.* ¶¶ 47, 51-52.

Fund, all of the Funds were audited by E&Y for years ending March 31.[18] Beacon Hill sent investors

audited financial statements following each audit.[19]

According to the SAC, Beacon Hill was required to provide E&Y with independent

corroboration of the Funds' stated values for the CMOs in the Funds' portfolios. In addition, E&Y's

internal guidelines provided that E&Y was required to evaluate price differences for all securities

where the difference between the Beacon Hill-provided value and the independently-obtained value

exceeded five percent.[20]

Plaintiffs allege that Beacon Hill satisfied its need to provide corroborating values

by accumulating "from a wide array of sources" numerous independently determined price marks

for each CMO in a fund's portfolio and then providing to E&Y "only that mark or value . . . that

came closest to the manipulated results" of its two-step valuation method.[21]

The SAC alleges that the Beacon Hill Defendants occasionally were unable to "cherry

pick" independently determined values sufficiently close to their internally generated values for some

CMOs. In some instances, this led them to make further manual adjustments to CMO values in order

---

18

     *Id.* ¶ 65.

19

     *See id.* ¶¶ 150-291 (alleging plaintiffs' receipt of documents sent by Beacon Hill, including audited financial statements).

20

     *Id.* ¶¶ 136. Plaintiffs allege also that E&Y was required to perform an independent valuation if the portfolio value of a fund as determined using Beacon Hill's prices exceeded the value as determined using independent prices by a certain "tolerable error" ("TE"). Plaintiffs allege inconsistently that the TE for the Master Fund was $460,055, *id.* ¶ 136, and $4,600,550, *id.* ¶ 141.

21

     *Id.* ¶ 67.

7

to bring them within a range of values for which independent corroboration existed.[22] In others, Beacon Hill turned to Prudential and BAS to obtain "false" corroboration. According to the SAC,

> "unlike other brokers that provided marks to the Beacon Defendants, Prudential and BAS did not determine CMO values and provide them to Beacon Hill. Rather, Beacon Hill requested that these brokers provide it with specific marks and then confirm those values to the Funds' auditors *as if the brokers had determined the prices themselves.*"[23]

### 1.    *Bristol's 2000 Audit*

In connection with Bristol's audit for the year ending March 31, 2000, plaintiffs allege that Beacon Hill first determined the fund's NAV using the Hedge Alloc Spreadsheet. It then cherry picked CMO values from a range of independent sources including Bear Stearns, its primary broker, as well as DLJ, Merrill Lynch, IDC, and Bloomberg, but not Prudential. Next, it made manual downward adjustments because the values produced by the Hedge Alloc Spreadsheet were "dramatically inconsistent" with the values obtained from the independent sources. This, however, resulted in a $2 million decrease in Bristol's NAV. Beacon Hill therefore manually increased the values of 31 CMOs. According to plaintiffs, these upward adjustments more than eliminated the decrease in NAV.[24]

Beacon Hill then sought corroboration from Prudential for its adjusted values. On April 12, 2000, Daniels sent a list of the 31 CMOs in Bristol's portfolio to Isaac Kearney, a

---

[22]   *E.g.*, *id.* ¶¶ 114-115.

[23]   *Id.* ¶ 8 (emphasis in original).

[24]   *Id.* ¶¶ 70-74.

8

Prudential broker, along with their "prices" as determined by Beacon Hill. Two days later, Kearney faxed to Beacon Hill on Prudential letterhead an identical list of securities with identical prices. According to the SAC, "Kearney did not even bother to retype the list of CMOs; rather, he took the e-mail from Beacon Hill, cut out the price list, and pasted it to Prudential's letterhead with the indication, 'Prices as of 3-31-00 for Beacon Funds.'"[25] This, plaintiffs allege, made it look as though Prudential had arrived independently at the values provided.[26]

According to the SAC, Beacon Hill then manually reduced certain values because its upward adjustments to the values of the 31 CMOs increased Bristol's NAV above Beacon Hill's target for the period ended March 31, 2001. Bristol's NAV after this round of adjustments was within $50,000 of the original output from the Hedge Alloc Spreadsheet. Beacon Hill then sent the newly adjusted values to E&Y with a cherry picked selection of independent prices as well as the list of prices obtained from Prudential. Prudential allegedly confirmed to E&Y the accuracy of the marks it provided to Beacon Hill.[27]

Plaintiffs allege also that Beacon Hill's manipulation of CMO values "was not limited to its collusion with Prudential." It adjusted also the values of other CMOs "in order to enable the collection of cherry-picked independent marks." When some of the CMOs were "clearly overvalued," plaintiffs allege, Beacon Hill made manual downward adjustments to those values. In

---

[25]   *Id.* ¶ 103.

[26]   *Id.* ¶ 74.

[27]   *Id.* ¶¶ 75-76.

9

order to offset these decreases, it allegedly made upward adjustments to the values of other CMOs.[28]

According to plaintiffs, Beacon Hill made these upward and downward adjustments for purposes of

Bristol's 2000 audit and then largely reversed them for purposes of its April 2000 valuation of

Bristol's portfolio.[29]

On May 12, 2000, Beacon Hill released Bristol's audited financial statements as of

and for the year ending March 31, 2000, which reported the fund's NAV and included a statement

by E&Y that the financial statement "present[ed] fairly, in all material respects, the financial position

of Bristol Fund Ltd. at March 31, 2000."[30]

### 2.    *Safe Harbor's 2000 Audit*

Plaintiffs allege that Kearney no longer worked at Prudential when it came time for

the audit of Safe Harbor for the year ending December 31, 2000. When Beacon Hill was unable to

cherry pick corroborating values for some of the CMOs in Safe Harbor's portfolio, it could not turn

to Prudential for assistance.[31]

On January 18, 2001, Irwin sent an email to IDC, an independent pricing service,

which previously had published prices as of December 29, 2000 for certain CMOs in Safe Harbor's

---

[28]

*Id.* ¶ 105.

[29]

*Id.* ¶ 106.

[30]

Amended Complaint (docket item 42) Ex. D (Bristol's audited financial statement for year ending March 31, 2000).

[31]

Cpt. ¶ 109

portfolio. The e-mail asked IDC to take a "second look" at some of the prices and issue new values as of December 29. On January 31, David Levy of IDC responded that IDC would not "reprice bonds once those prices have already been released," but that it would "re-evaluate sectors going forward" based on newly available information. Levy provided Irwin with a list of reevaluated prices for 10 CMOs as of December 29, 2000, and reemphasized that IDC would not change the prices it had released.

According to the SAC, Irwin "secretly altered the IDC e-mail. He took out those parts of the IDC e-mail that were not helpful," such as the prices for five of the CMOs and the portions of the e-mail emphasizing that IDC would not release new prices. Irwin then printed the "altered" email and sent it to auditors.[32] Allegedly, "Beacon Hill created a second secretly altered e-mail using the exact same technique" and "[f]rom the two fake e-mails, Beacon Hill drew new values for 10 of the CMOs in Safe Harbor's portfolio," thus allowing it to overstate Safe Harbor's NAV.[33]

### 3. Bristol's 2001 Audit

Plaintiffs allege that, starting around December 2000, the value of the Funds' short U.S. treasury position began to fall. Beacon Hill's stated CMO values grew accordingly as a result of the calculations performed by the Hedge Alloc Spreadsheet. For many CMOs, plaintiffs allege, "the resulting prices were simply absurd." This is indicated, they claim, by the fact that one CMO in Milestone's portfolio and another in Bristol's portfolio each was determined months later to have

---

[32]       *Id.* ¶¶ 109-112.

[33]       *Id.* ¶ 113.

a strongly negative option adjusted spread ("OAS").[34] According to the SAC, a strongly negative OAS signals that a CMO is overvalued.[35]

Plaintiffs allege further that Kearney got a new job at BAS just prior to Bristol's audit for the year ending March 31, 2001, in part because Beacon Hill offered to provide BAS with lucrative business if it would hire Kearney.[36] While at BAS, Kearney allegedly continued to assist the Beacon Hill Defendants in deceiving auditors.

According to the SAC, Bristol on March 29, 2001 purchased from Milestone a CMO called GECMS 1998-13 at a price of $99.8125. On April 9, 2001, Bear Stearns allegedly sent Beacon Hill a list of March month-end prices for 32 CMOs that included a price of $100.7028 for GECMS 1998-13. According to plaintiffs, Beacon Hill then assigned GECMS 1998-13 a March month-end value of $118.04 and requested that Bear Stearns send a new list of values. On April 11, Bear Stearns partially complied, although its list did not contain a price for GECMS 1998-13. This list was sent to E&Y as corroboration for some of Beacon Hill's prices. "Beacon Hill then obtained the inflated value of 118.31 from BAS to corroborate its obviously inflated month-end value" of $118.04.[37]

Plaintiffs claim that the $118.04 value for GECMS 1998-13 that Beacon Hill used

---

[34]

    *Id.* ¶ 114.

[35]

    The OAS is the incremental rate at which investors are compensated for investing in a risky CMO instead of risk-free treasury bonds. *Id.* ¶ 114 & n.7 (citing complaint in *SEC v. Beacon Hill Asset Mgmt. LLC*, No. 02 Civ. 8855 (LAK)).

[36]

    *Id.* ¶ 80.

[37]

    *Id.* ¶¶ 81-83, 128. The SAC does not allege when BAS's mark of $118.31 was sent to E&Y, or who sent it.

to determine NAVs "increased Bristol's portfolio value by more than $585,000, or approximately 46% of Bristol's net income for the preceding month." Allegedly, the Beacon Hill Defendants used in total "35 'corroborating' values from BAS," allowing them to overstate Bristol's portfolio value even further.[38] The SAC does not specify when these values were sent to E&Y or who sent them.

Bristol's 2001 audited financial statement was released on May 24. Beacon Hill reported the fund's NAV as of March 31, 2001, and E&Y once again stated that the information in the financial statement was fair and accurate.[39]

### 4.    The Master Fund's 2002 Audit

BAS allegedly assisted Beacon Hill in misstating NAVs in connection with the Master Fund's March 31, 2002 audit.[40] According to plaintiffs, Beacon Hill was unable to cherry pick independent marks to corroborate the manipulated values for all of the CMOs in the Master Fund's portfolio and so once again turned to Kearney at BAS.[41]

On May 20, 2002, plaintiffs allege, Irwin e-mailed to Kearney a list of 31 CMOs in the Master Fund's portfolio and their Beacon Hill-determined prices. Irwin asked Kearney to transfer the prices to BAS's letterhead "so we can double check them one more time before we give you the

---

[38]

    *Id.* ¶¶ 81-84.

[39]

    Amended Complaint Ex. D. (Bristol's audited financial statement for year ending March 31, 2001).

[40]

    Cpt. ¶¶ 85-86.

[41]

    *Id.* ¶¶ 86-87.

13

go ahead to send them to auditors." The next day, Kearney complied and sent an identical list of prices on BAS letterhead to E&Y.[42] Plaintiffs allege that BAS was aware that the figures it provided were not legitimate valuations and that they would be used for the purpose of deceiving Beacon Hill's auditors.[43]

On May 31, 2002, Beacon Hill released the Master Fund's audited financial statement for the period January 2 to March 31, 2002. E&Y signed off on the statement as a fair representation of the Master Fund's financial position.[44]

III.     The Collapse

The Beacon Hill Defendants allegedly employed their scheme in order to conceal that the Funds actually were suffering substantial losses. In October and November 2002, however, Beacon Hill made three disclosures that revealed the extent of the Funds' losses.

First, "[o]n October 8, 2002, Beacon Hill disclosed to investors, including the plaintiffs, that the NAVs of the Funds declined by an estimated 25% in September. This disclosure was prompted by Bear Stearns' refusal to provide additional financing due to the material over-valuation of the portfolios and Bear Stearns reporting this situation to the SEC."[45]

---

[42]

   *Id.* ¶¶ 88-89.

[43]

   *Id.* ¶ 91.

[44]

   Amended Complaint Ex. D (Master Fund's audited financial statement for period January 2 to March 31, 2002).

[45]

   Cpt. ¶ 292.

Second, "[o]n October 17, 2002, following inquiries from the SEC, Beacon Hill disclosed to investors, including the plaintiffs, that, as of September 30, 2002, the NAVs for the Funds actually declined by 54% from the reported NAVs as of August 31, 2002. In this disclosure, Beacon Hill admitted that a portion of the Funds' losses occurred prior to August 31, 2002."[46]

Finally, "[o]n November 27, 2002, Beacon Hill disclosed that the NAV of the Funds had actually declined by 61.22% from the NAV reported as of August 31, 2002."[47] The SAC alleges that, "[i]n actuality, the NAVs of the Funds had been declining for years."[48]

Plaintiffs allege that the Funds now are in liquidation and that "it has become increasingly . . . clear that much of the capital invested in these Funds has been lost."[49]

IV.   *The Litigation*

A.   *The SEC Case*

The disclosures by Beacon Hill in the fall of 2002 prompted an action in this Court by the SEC.[50] Without admitting or denying liability, the Beacon Hill Defendants consented to entry of a final judgment and injunction pursuant to which they were obliged to pay $2.2 million in

---

[46]

*Id.* ¶ 293.

[47]

*Id.* ¶ 294.

[48]

*Id.* ¶ 295.

[49]

*Id.* ¶ 4.

[50]

*SEC v. Beacon Hill Asset Mgmt. LLC*, No. 02 Civ. 8855 (LAK).

15

disgorgement and $2 million in civil penalties.[51]


B.      *Prior Proceedings in this Case*

1.      *Motions to Dismiss*

Plaintiffs commenced this action on April 8, 2003. The Court subsequently granted motions by the Beacon Hill Defendants and Asset Alliance Corp. to dismiss a corrected and supplemental complaint.[52] The Court granted also motions by Milestone Global Advisors, LP, and Asset Alliance Corp. to compel arbitration by Balentine Global Hedge Fund, L.P. and Balentine Hedge Fund Select, L.P. (the "Balentine Plaintiffs").[53]


2.      *The Amended Complaint*

In *Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC* ("*Fraternity Fund I*"),[54] the Court dismissed large portions of an amended complaint in this action, which did not name Prudential or BAS as defendants. The Court held, in relevant part, that plaintiffs failed to plead with

---

[51]

    *SEC v. Beacon Hill Asset Mgmt. LLC*, No. 02 Civ. 8855 (LAK), 2004 WL 2404096 (S.D.N.Y. Oct. 28, 2004).

[52]

    *Alteram S.A. v. Beacon Hill Asset Mgmt. LLC*, No. 03 Civ. 2387 (LAK), 2004 WL 367709 (S.D.N.Y. Feb. 27, 2004).

[53]

    *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571 (S.D.N.Y. 2005). The Court there dismissed claims against Milestone Global and Asset Alliance Corp. only. *See id.* at 573. It did not consider claims by the Balentine Plaintiffs against the Beacon Hill Defendants.

[54]

    376 F. Supp. 2d 385 (S.D.N.Y. 2005).

16

sufficient particularity that the Beacon Hill Defendants' statements of NAVs and how they would be calculated were fraudulent in the period prior to April 2002. The Court sustained allegations, however, that the Beacon Hill defendants fraudulently misrepresented NAVs for the period April to the fall of 2002.[55]

With respect to that time period, plaintiffs alleged that (1) Barry, Daniels, and Irwin profited from self-dealing by buying bonds from the Master Fund at prices lower than the values Beacon Hill placed on those bonds for purposes of computing the Funds' NAVs, (2) when Beacon Hill disclosed in October 2002 that the NAVs had declined by 54 percent from the values reported as of August 31, 2002, it admitted that a portion of the losses had occurred prior to August 31, 2002, and (3) the disparity between NAVs based on Beacon Hill-determined prices and those based on Bear Stearns prices more than doubled between June and July 2002 and increased from about 24 percent to about 37 percent from April until August. These factors considered together, the Court held, were sufficient to justify an inference that statements of NAVs were materially false during the period April to the fall of 2002.[56]

In addition, the Court held that plaintiffs adequately alleged *scienter*. The allegations of self-dealing by Barry, Daniels, and Irwin were sufficient to establish motive and opportunity on the part of those defendants. And allegations that Miszkiewicz had access to the Funds' pricing sheets and Bear Stearns' independent marks, supervised the determination of NAVs, and worked closely with Daniels and Irwin, who were performing pricing analyses, were sufficient to "give rise

---

[55]      *Id.* at 416.

[56]      *Fraternity Fund I*, 376 F. Supp. 2d at 396-97.

to a strong inference that [Miszkiewicz] acted recklessly with respect to whether valuations were materially false and misleading."[57]

The Court held also that plaintiffs adequately pleaded causation, and therefore reliance, as they alleged that they made or retained investments in reliance upon Beacon Hill's misrepresentations of NAVs and that they were injured when the overvaluation—the subject of the alleged misrepresentations—was revealed.[58]

Finally, the Court held that plaintiffs' allegations of fraud were sufficient to state a claim of breach of fiduciary duty as well for the period April to the fall of 2002.[59]

### 3. The Second Amended Complaint

The SAC makes largely the same allegations as the amended complaint concerning the period April to the fall of 2002[60] but expands upon allegations concerning earlier periods.

Plaintiffs are 45 investors in the Funds and the alleged successor in interest to an investor[61] who allegedly invested, in aggregate, approximately $265 million between 1997 and fall

---

[57]

    *Id.* at 404.

[58]

    *Id.* at 402-03.

[59]

    *Id.* at 408-10.

[60]

    *See, e.g.*, Cpt. ¶¶ 6, 56 (percentage differences between NAVs as determined using Beacon Hill prices and as determined using Bear Stearns prices); *id.* ¶ 293 (October 2002 disclosure that losses occurred prior to August 31, 2002); *id.* ¶ 303-304 (self dealing); *id.* ¶¶ 59, 63 (Miszkiewicz's recklessness); *id.* ¶¶ 150-291 (Beacon Hill's representation of NAVs to each plaintiff).

[61]

    *Id.* ¶ 14

2002.[62] All but the Balentine Plaintiffs, who invested only in Milestone, invested in Bristol and/or Safe Harbor.[63]

      All but the Balentine Plaintiffs assert against the Beacon Hill Defendants claims, *inter alia*, for violations of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act")[64] and Rule 10b-5 thereunder,[65] common law fraud, and breach of fiduciary duty. Their gist is that the Beacon Hill Defendants misrepresented the Funds' NAVs and the methods by which they would be calculated.[66]

      Prudential and BAS are sued for aiding and abetting common law fraud and breach of fiduciary duty.[67] They now move to dismiss the SAC as to them. They argue principally that the

---

[62]

    *Id.* ¶ 1.

    Ten plaintiffs have joined this action since the first amended complaint was filed. The aggregate amount alleged to have been invested has increased by nearly $160 million. *Compare* Amended Complaint ¶¶ 1, 15 *with* Cpt. ¶¶ 1, 14.

[63]

    Cpt. ¶ 14.

[64]

    15 U.S.C. § 78j(b).

[65]

    17 C.F.R. § 240.10b-5.

[66]

    The SAC asserts also claims against Asset Alliance Corp. for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and for breach of contract and fiduciary duty. The Balentine Plaintiffs assert claims against the Beacon Hill Defendants for aiding and abetting fraud and breach of fiduciary duty by Milestone Global, a general partner of Milestone. Finally, certain investors in Safe Harbor assert a claim of contract breach against SHAM, a general partner of Safe Harbor.

[67]

    *See* Cpt. ¶¶ 391-419.

    Plaintiffs do not allege primary violations by Prudential and BAS of the Exchange Act. It is unclear whether they seek to hold Prudential and BAS liable for aiding and abetting

19

SAC fails to state claims of aiding and abetting. They argue also that plaintiff Oran Ltd. ("Oran")

lacks standing and that plaintiffs have failed to plead grounds for punitive damages.

*Discussion*

I.    *Motion to Dismiss Standard*

In deciding a motion to dismiss, the Court ordinarily accepts as true all well-pleaded

factual allegations and draws all reasonable inferences in the plaintiff's favor.[68] Dismissal is

inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support

of his claim which would entitle him to relief."[69] Fraud claims, however, are subject to a more

stringent standard.

Allegations of fraud, and of breach of fiduciary duty consisting of fraud by a

--------

federal securities fraud. Any such claim, however, would not be viable. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A*, 511 U.S. 164, 191 (1994) (no private cause of action for aiding and abetting a Rule 10b-5 violation); *accord Wright v. Ernst & Young LLP*, 152 F.3d 169, 174-76 (2d Cir. 1998). The Court therefore construes the SAC as asserting claims against Prudential and BAS only for aiding and abetting common law fraud and breach of fiduciary duty.

While plaintiffs do not assert federal claims against these defendants, the Court has supplemental jurisdiction over the aiding and abetting claims pursuant to 28 U.S.C. § 1367, as they are intimately related to and involve substantially the same facts as the federal securities fraud claims against the Beacon Hill Defendants. *E.g.*, *Auscape Int'l v. Nat'l Geographic Soc.*, 461 F. Supp. 2d 174, 178 n.8 (S.D.N.Y. 2006).

68

*E.g.*, *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002).

69

*Id.*; *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

fiduciary, are governed by Federal Rule of Civil Procedure 9(b),[70] which requires that the circumstances constituting fraud be stated with particularity.[71] This means that the complaint must (1) specify the statements that the plaintiffs contend were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.[72] In addition, the complaint must allege facts from which a strong inference of fraudulent intent may be drawn.[73] This is accomplished by alleging facts indicating that the defendants had both motive and opportunity to commit fraud or facts that amount to strong circumstantial evidence of conscious misbehavior or recklessness.[74]

## II.    *Aiding and Abetting*

In order to recover on a claim for aiding and abetting fraud, plaintiffs will be obliged to establish that the Beacon Hill Defendants committed a primary wrong – that is, that they

---

[70]

       *E.g.*, *Krause v. Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 332, 338 & n.49 (S.D.N.Y. 2005)*.*

       The claims of breach of fiduciary duty in this case allege actual fraud. Plaintiffs allege that the Beacon Hill Defendants owed them fiduciary duties as managers of plaintiffs' assets and that they breached their duties by "falsely reporting the value of plaintiffs' investments." Cpt. ¶ 327, 329.

[71]

       Fed. R. Civ. P. 9(b).

[72]

       *In Re Parmalat Secs. Litig.*, 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005) (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994))).

[73]

       *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

[74]

       *Id.* (quoting *Shields*, 25 F.3d at 1128).

defrauded plaintiffs, that the moving defendants knew of the primary violation, and that they lent substantial assistance to the Beacon Hill Defendants in committing the primary wrong.[75]

Similarly, "[a] claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."[76]

"These causes of action are parallel in several respects,"[77] especially where, as here, the same activity is alleged to constitute the primary violation underlying both claims.[78] Knowledge of the primary violation with respect to one claim will entail knowledge of the primary violation with respect to the other. Moreover, when a plaintiff adequately pleads substantial assistance in connection with a fraud claim, he or she fulfills also the participation element of the breach of fiduciary duty claim.[79]

### A.    *Primary Violation*

---

[75]

*Lerner*, 459 F.3d at 292-95; *Krause*, 356 F. Supp. 2d at 338.

[76]

*Lerner*, 459 F.3d at 294 (quoting *Kaufman v. Cohen*, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dep't 2003)).

[77]

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs.*, LLC, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006).

[78]

*See* Cpt. ¶¶ 400, 415 (alleging breach of fiduciary duty by Beacon Hill Defendants based on their "misrepresenting the value of the securities in Funds' portfolios")

[79]

*Pension Comm.*, 446 F. Supp. 2d at 201 (citing *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996)); *see Lerner*, 459 F.3d at 294 ("[A] person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator." (quoting *Kaufman*, 307 A.D.2d at 125, 760 N.Y.S.2d at 169)).

"To state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury."[80]

### 1.   *April to Fall 2002*

The allegations in the SAC concerning the period April to the fall of 2002 are the same in all material respects as those in the amended complaint, which the Court held in *Fraternity Fund I* were sufficient to allege common law fraud and breach of fiduciary duty. Accordingly, plaintiffs adequately have alleged primary violations for that period for purposes of their aiding and abetting claim against BAS in connection with the Master Fund's 2002 audit.[81]

### 2.   *Earlier Periods*

As plaintiffs allege also that Prudential and BAS aided and abetted Beacon Hill during the spring of 2000 and the spring of 2001 respectively, the initial question is whether the SAC now sufficiently alleges a primary violation by the Beacon Hill Defendants during those periods. The logical starting point is whether the pleading now sufficiently alleges that the statements of NAV were materially false, which requires consideration of what that means in the context of this case.

---

[80]

    *Lerner*, 459 F.3d at 291 (quoting *Kaufman*, 307 A.D.2d at 119, 760 N.Y.S.2d at 165).

[81]

    Plaintiffs make numerous allegations with respect to the time period between Bristol's 2001 audit and the spring of 2002, when the Master Fund's 2002 audit was conducted. *See* Cpt. ¶¶ 117-125. It is unnecessary to expand upon these here, as plaintiffs' allegations for the period April to fall 2002 are sufficient to allege a primary violation for purposes of the claims that BAS aided and abetted fraud in connection with the Master Fund's March 2002 audit, as BAS's alleged actions took place in May of that year. *See id.* ¶ 89.

### a.    Material Falsity and CMOs

The NAVs depended, at least in significant measure, upon the value of the CMOs held by the Funds. It therefore is important to focus on the nature of those securities and their valuation.

> CMOs
>
> "are bonds that represent claims to specific cash flows from large pools of home mortgages. The streams of principal and interest payments on the mortgages are distributed to the different classes of CMO interests, known as tranches, according to a complicated deal structure. Each tranche may have different principal balances, coupon rates, prepayment risks, and maturity dates (ranging from a few months to twenty years).
>
> "CMOs are often highly sensitive to changes in interest rates and any resulting change in the rate at which homeowners sell their properties, refinance, or otherwise pre-pay their loans. Investors in these securities may not only be subjected to this prepayment risk, but also exposed to significant market and liquidity risks."[82]
>
> CMOs are traded between investors and dealers rather than on exchanges.[83] The

---

[82]   U.S. Secs. and Exch. Comm., *Collateralized Mortgage Obligations (CMOs)* (available at http://www.sec.gov/answers/tcmos.htm) (last visited Mar. 25, 2007). *See also* Secs. Indus. and Fin. Mkts. Ass'n, *Types of Bonds (CMOs): The Various Types of CMOs* (available at http://www.investinginbonds.com/learnmore.asp?catid=5&subcatid=17&id=35)   (last visited Mar. 25, 2007).

[83]   Secs. Indus. and Fin. Mkts. Ass'n*, Types of Bonds (CMOs): Minimum Investments, Transaction Costs, and Liquidity* (available at http://www.investinginbonds.com/learnmore.asp?catid=5&subcatid=17&id=36)   (last visited Mar. 25, 2007).

degree of liquidity varies.[84] Hence, valuation of CMOs is not a precise science.[85] Where there is sufficient liquidity for a given CMO, a value may be based on one or more price quotes, or marks, from independent dealers, although different dealers may quote different prices for the same bond and thus require one seeking to value that bond to exercise judgment in fixing a value. A judgment as to value may be made also by making appropriate assumptions about such matters as prepayment risks and future market interest rates and using complex financial models that seek to take account of the characteristics of particular CMOs, the impact on prepayment rates of possible changes in interest rates, and other pertinent factors.[86]

Regardless of method, the nature of the market for CMOs means that a statement as to the value of a CMO, and therefore as to the NAV of a share of a fund holding CMOs in its portfolio, may be considerably more a statement of opinion than a report of an objectively determinable fact. But, as with so many other things, context is important. If, for example, a fund's prospectus or offering memorandum had stated that portfolio values in all cases would be determined by averaging three independent marks for each security, a statement of NAV in substance could be an implicit representation that the portfolio value as of a given date had been determined in that manner and that the NAV had been computed on that basis. On the other hand, if a fund's prospectus

---

[84]

Id.

[85]

See Primavera Familienstiftung v. Askin, 173 F.R.D. 115, 124 (S.D.N.Y.1997) ("Valuing CMOs is 'an art, not a science'" (quoting Primavera Familienstiftung v. Askin, No. 95 Civ. 8905 (RWS), 1996 WL 494904, *21 (S.D.N.Y. Aug. 30, 1996) (citing Kidder Peabody & Co. v. Unigestion Int'l Ltd., 903 F. Supp. 479, 499 (S.D.N.Y.1995)))).

[86]

See generally, e.g., FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 587-700 (1995) (discussing various methods for valuing mortgage backed securities, including CMOs, and the factors pertinent to different models).

or offering memorandum had stated that portfolios would be determined by the fund's advisor, taking into account such independent marks as it might obtain, a statement of NAV would imply no more than that the advisor considered whatever independent marks it obtained and then made its own decision as to value. In the former case, it would be a representation of fact. In the latter, it would be considerably closer to a representation that the NAV was based upon the advisor's (presumably good faith) judgment as to the value of the underlying securities.

> b.      *This Case*

This point is illustrated by comparing the Funds' offering memoranda. Milestone's memorandum stated that

> "[f]or purposes of preparing . . . monthly statements, the General Partner will price the Partnership's portfolio securities based upon the mean between the bid and the asked prices for such securities received from the partnership's brokers and dealers. . . . For purposes of preparing . . . quarterly statements, the General Partner will price the Partnership's portfolio securities based upon the average of the mean between the bid and the asked prices for such securities received from the partnership's brokers and dealers."[87]

Given this language, the question whether statements of Milestone's NAV were materially false apparently would be susceptible of a straightforward, objectively determinable answer. It would come down to whether Beacon Hill in fact determined CMO values using the mean of the bid and ask prices of its brokers and dealers.

Bristol's offering memoranda, on the other hand, stated that "[t]he Fund's securities are generally not traded on an exchange and [that] there are no published prices to which the

---

[87]      Cpt. ¶ 40; Amended Complaint Ex. B (Milestone offering memorandum).

Investment Manager may refer in valuing the Fund's securities. The Investment Manager will independently value the Fund's securities based upon certain models and the prices quoted for similar securities."[88] The memoranda for Safe Harbor and the Master Fund contained the same or similar language.[89] As the documents represented only that the fund's manager independently would value the securities "based upon" models and prices quoted for "similar" securities, they made clear that statements of NAV would rest to a large degree upon the managers' judgment. In this context, Beacon Hill's representations of NAVs of Bristol, Safe Harbor, and the Master Fund in essence were representations that the NAVs reflected management's honest opinions, based in some unspecified manner on unspecified models and prices quoted for "similar securities," as to the values of the underlying securities. The question of material falsity therefore is whether plaintiffs' allegations, if true, would support a strong inference that these representations were false—not because the values were "wrong" in some empirical sense, but because the totality of the evidence would give rise to a strong inference that management did not give its honest opinion.[90]

---

[88]
> *Fraternity Fund I*, 376 F. Supp. 2d at 399 n.85 (citing Amended Complaint Ex. B (Bristol offering memoranda for 1997 and 2000)).

[89]
> *See* Amended Complaint Ex. B (Safe Harbor offering memoranda for 1997 and 2002).
>
> The Master Fund offering memorandum is not before the Court on these motions. The SAC alleges, however, that the Master Fund's Amended and Restated Memorandum and Articles of Association provided that securities traded on an exchange or over the counter would be valued by looking at market quotations, but that "[s]ecurities or other assets for which market quotations are not readily available will be valued at their fair value as determined in good faith in accordance with procedures adopted by the Investment Manager." Cpt. ¶ 41.

[90]
> It is important to note that the mere fact that Beacon Hill promised to value NAVs in good faith and then allegedly did not do so would not necessarily state fraud claims. "[A] failure to perform promises of future acts is not fraud unless there exists an intent not to comply

Here, BAS and Prudential are accused of aiding and abetting fraud with respect to statements of NAV for Bristol and the Master Fund. In consequence, the pertinent issue is whether the SAC adequately alleges that the NAVs issued by the Beacon Hill Defendants did not reflect their honest views as to value.

### (a)    Bristol's 2000 Audit

Plaintiffs argue that, during the spring of 2000, Beacon Hill used the Hedge Alloc Spreadsheet to maintain the appearance that Bristol's overall portfolio value remained constant as its short U.S. treasury position lost value. Beacon Hill then cherry picked independent marks to corroborate the resulting CMO values, but where no corroboration existed either adjusted the CMO values so that they would be sufficiently close to independent marks or sought Prudential's phony corroboration. According to plaintiffs, this demonstrates that Beacon Hill targeted an NAV for Bristol's audit period and adjusted values so as simultaneously to keep Bristol's portfolio value

---

with the promise at the time it is made." *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir. 1987) (citing *Chase Manhattan Bank v. Perla*, 65 A.D.2d 207, 411 N.Y.S.2d 66, 68 (4th Dep't 1978)). But this does not mean that plaintiffs' case necessarily turns on the Beacon Hill Defendants' intentions at the time the offering memoranda were released.

Under New York law, a duty to update past representations arises when a statement of future intention, "reasonable at the time it is made, becomes misleading because of a subsequent event." *In re Int'l Bus. Machs. Corp. Secs. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998). If Beacon Hill intended to determine NAVs in good faith but subsequently did not do so, a duty to update arguably would have arisen, as the offering memoranda would have become misleading. Moreover, Beacon Hill's breach of that duty would have changed the nature of its subsequent statements of NAVs. Those statements, absent Beacon Hill's disclosure that it had changed its valuation method, would have become implicit representations that the valuation method described in the offering memoranda in fact had been complied with. In that case, the fact that the Beacon Hill Defendants did not determine the NAVs in good faith could constitute fraud, regardless of their intentions at the time the offering memoranda were released.

relatively constant and individual CMO values within the range of what could be supported by independent marks, regardless of their true market value.

The argument has superficial appeal. But greater scrutiny reveals that it is not as strong as it first appears.

(i)      *The Hedge Alloc Spreadsheet*

The first problem is that the argument is premised on the belief that it necessarily or probably was unreasonable for an honest manager to begin the process of valuing a portfolio of CMOs by assuming that the portfolio's value was an inverse function of the value of short U.S. treasury positions. But the SAC fails to allege facts sufficient to warrant such a conclusion. Certainly CMOs, the values of which are sensitive and negatively related to interest rate changes (i.e., value drops in response to increases in interest rates), would be expected to move in the opposite direction as the values of short positions in U.S. treasuries (the value of which would rise in response to an increase in interest rates). The critical question is whether the relationship between price movements for the benchmark short treasury position and those of the CMO portfolio is sufficiently close. So the fact that the Beacon Hill Defendants used short treasury positions as a benchmark to approximate the value of the CMO portfolios, in and of itself, suggests little or nothing. It may have been entirely reasonable or quite dishonest, depending upon the facts. And the SAC fails to allege any facts that suggest that it was one or the other.

Nor is much added by the allegation that the Beacon Hill Defendants, in this initial step in determining the NAVs, allocated the assumed change in the aggregate value of the CMO positions to individual securities. The SAC alleges no context from which to evaluate whether the

assumptions underlying the Hedge Alloc Spreadsheet were reasonable. The allegations therefore are equally consistent with an inference of fraud and with an inference that Beacon Hill used the spreadsheet in good faith as a way initially to determine the approximate effect interest rate changes had on the fund's investments.

### (ii)    *Manual Adjustments*

Furthermore, if the Hedge Alloc Spreadsheets were used to determine approximate starting points for valuing CMOs, manual adjustments to the spreadsheet-produced values would not necessarily or even probably have been improper. Plaintiffs allege that a series of adjustments was made and, in some instances, the sizes of the adjustments. But it is at best unclear what inference ought to be drawn from this. Beacon Hill may have made the adjustments dishonestly in order to reach predetermined results. But it may have made the adjustments as it incorporated such market information as was available in an effort to make its CMO values as accurate as possible.

### (iii)    *"Cherry Picking" Values*

That Beacon Hill allegedly cherry picked independent marks to corroborate its CMO values comes closer to raising an inference of fraud. Even assuming that the Beacon Hill Defendants were entitled, so far as Bristol's offering memorandum was concerned, to value the CMOs simply on the basis of their own judgment, that would not have been good enough for auditors. The Beacon Hill Defendants were required to show E&Y that their judgment produced values sufficiently close to those determined by independent sources. If they attempted to evade this obligation, then one could infer that their CMO values were not determined honestly.

The allegations in the SAC, however, do not necessarily make out a strong case that Beacon Hill dishonestly sought to evade this obligation. Plaintiffs do not allege, for example, that Beacon Hill was required to use only one source's marks or that it was the norm in the industry to do so. Indeed, the SAC indicates that E&Y accepted the marks Beacon Hill provided and approved Beacon Hill's statements of NAVs despite the practice of cherry picking. The allegations of cherry picking alone therefore do not necessarily indicate fraud. But plaintiffs allege more.

<em>(iv)      Correspondence with Prudential</em>

According to the SAC, after Beacon Hill sought marks from five sources, it still had not obtained corroboration for all of its CMO values. It then turned to Prudential in April 2000.

After Beacon Hill sent a list of values to Prudential – which in and of itself is not necessarily indicative of bad faith, as Beacon Hill may have been asking Prudential to examine and, if appropriate, correct its values – Prudential responded with an identical set of marks. Given the nature of CMOs, it does not seem very likely that Prudential independently valued 31 CMOs exactly the same as Beacon Hill. Accordingly, this strengthens the inference that Beacon Hill used Prudential to evade its obligation to E&Y. It is possible, however, that Beacon Hill sent its values to Prudential in good faith without the expectation that Prudential would rubber stamp them. That Kearney may have been dishonest in suggesting that he had performed an independent valuation does not necessarily indicate that the values fixed by the Beacon Hill Defendants were not their honest opinions.

<em>(b)      Bristol's 2001 Audit</em>

The allegations with respect to the period between Bristol's 2000 and 2001 audits are largely duplicative of the allegations regarding the spring of 2000. Plaintiffs allege that Beacon Hill used its two-step valuation method to determine CMO values, cherry picked independent marks to corroborate them, and received corroboration from BAS when independent values were not sufficiently close to their own. The allegations that BAS supplied false corroboration to Beacon Hill during this period, however, are substantially less detailed than the allegations of Beacon Hill's April 2000 correspondence with Prudential. Plaintiffs allege that BAS supplied "35 'corroborating' values" to Beacon Hill in connection with Bristol's 2001 audit.[91] But they fail to allege any particulars. They do not allege the manner in which Beacon Hill requested corroboration from BAS. Nor do they allege what values BAS supplied – with the exception of the $118.31 value for GECMS 1998-13 – when the values were sent to E&Y, who sent them, or how they compared to marks provided by other sources. While the allegations concerning Prudential's actions in the spring of 2000 go some way toward indicating Beacon Hill's bad faith, the allegations of BAS's actions in the spring of 2001 go a significantly shorter distance. Furthermore, the additional allegations during the period between Bristol's 2000 and 2001 audits add only somewhat to plaintiffs' case.

### (i)    The IDC E-mail

First, that Beacon Hill sent to E&Y only a portion of the January 30 e-mail from David Levy does not raise a strong inference that Beacon Hill acted in bad faith in determining CMO values. Plaintiffs do not allege that Beacon Hill changed the values in Levy's e-mail. They allege only that

---

[91]    *Id.* ¶ 84.

it sent some of the values and not others—in other words, that it cherry picked the marks, which, by itself, does not necessarily show bad faith.

Plaintiffs allege also that Beacon Hill neglected to include Levy's statement that the marks provided were reevaluations of bond prices as of December 29, 2000 in light of new information. Plaintiffs do not contend, however, that it is improper to reevaluate CMOs as of a certain date in light of newly acquired information. Nor do they allege that a reevaluation of a CMO after an initial pricing could not be used as corroboration for purposes of a fund's audit

### (ii)    Negative OASs

Second, that Beacon Hill's Hedge Alloc Spreadsheet produced values that resulted in some bonds having a negative OAS does not raise an inference that the spreadsheet was employed in bad faith. As noted, using the Hedge Alloc Spreadsheet to make initial approximations of Bristol's portfolio value as interest rates changed was not necessarily improper. Furthermore, the SAC alleges that once the CMOs were determined to have negative OASs, Beacon Hill adjusted their values downwards.[92] This does not rule out the possibility of fraud. But it is consistent also with the inference that Beacon Hill made adjustments in order to fine tune the spreadsheet-produced values as it learned that they were not entirely accurate in representing the bonds' market values.[93]

---

[92]

*See* Cpt. ¶¶ 115-116.

[93]

Additionally, even if Beacon Hill had not made these downward adjustments, the negative OASs themselves would not necessarily have indicated fraud. A negative OAS may signal that a bond is overpriced, but it does not necessarily signify that the model used to determine the price that led to the negative OAS was fraudulent in the first place. Plaintiffs do not allege that a negative OAS could not be the product of a proper pricing model.

*(iii)   Repricing Bonds*

The argument that Beacon Hill acted dishonestly by selling bonds at lower prices that it used to determine NAVs strengthens plaintiffs' hand with respect to this period.

Beacon Hill is alleged to have assigned GECMS 1998-13 a value of $99.8125 on March 29, 2001. On April 9, 2001, Bear Stearns provided the Beacon Hill Defendants with a price for that bond as of March 31 of $100.7028. Beacon Hill, at some unspecified time and for purposes of Bristol's audit for the year ended March 31, priced the same security as of that date at $118.04. As the Bear Stearns price quite plainly did not support the Beacon Hill Defendants' valuation, they turned to BAS to corroborate the value of $118.04.

These allegations are troublesome, at least in the absence of evidence of some extraneous event or information that could have led the Beacon Hill Defendants to believe in good faith that a CMO they considered to be worth $99.8125 on March 29 had risen in value to $118.04 in a mere two days. While the Court acknowledges that CMOs properly may be revalued as of a given date in light of new information, the magnitude of this difference suggests dishonesty. Nevertheless, it is not necessary to decide that question now.

\*   \*   \*

As noted elsewhere, the Court already has determined that plaintiffs sufficiently have stated a claim that the Beacon Hill Defendants engaged in a fraud by misrepresenting the Funds' NAVs during the period from April through the fall of 2002. The foregoing discussion demonstrates that the question whether they made materially false representations on that subject prior to April 2002 is not free from doubt. The allegations concerning the periods of Bristol's 2000 and 2001 audits,

when taken together, may raise the inference that Beacon Hill's values at those times were false in the sense described above.[94] But it would not be desirable to resolve that issue on these motions if it is unnecessary to do so because the Beacon Hill Defendants have not been heard on the issue. As the Court concludes that the SAC does not adequately allege aiding and abetting against Prudential or BAS with respect to the period prior to April 2002, even assuming that the SAC alleges an earlier primary violation by the Beacon Hill Defendants, it need not be resolved now. Accordingly, the Court does not decide the question or address the other elements of a primary violation.

### B.    Knowledge

#### 1.    Pleading Knowledge Generally

The second element of an aiding and abetting claim is knowledge of the primary violation. Allegations of constructive knowledge or recklessness are insufficient. Plaintiffs must allege actual knowledge on the part of the defendant.[95] "The burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one."[96]

---

[94]    There also are allegations that cut the other way. Beacon Hill's alleged activity during the spring of 2000 preceded by more than two years its disclosure that the Funds had lost substantial value. Furthermore, plaintiffs do not allege any self-dealing on the part of the Beacon Hill Defendants during this period or that Beacon Hill's CMO values differed from those of independent sources by amounts that would have been considered abnormal in the industry. They allege only that NAVs determined using Bear Stearns' CMO values were 10 to 15 percent lower than NAVs determined using Beacon Hill values. Cpt. ¶ 56. But, as the Court held in *Fraternity Fund I*, bald allegations that the CMOs were overvalued do not raise an inference of fraud. 376 F. Supp. 2d at 397.

[95]    *E.g.*, *id.* at 412.

[96]    *Terrydale Liquidating Trust v. Barness*, 611 F. Supp. 1006, 1027 (S.D.N.Y. 1984) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983)).

As in the context of pleading a primary violation, pleading knowledge for purposes of an aiding and abetting claim requires allegations of facts that give rise to a "strong inference" of actual knowledge.[97]

### 2.    Conscious Avoidance

The parties dispute whether conscious avoidance is sufficient to satisfy the knowledge prong of an aiding and abetting claim. Plaintiffs cite *Cromer Finance Ltd. v. Berger*,[98] which held that "there is no reason to believe that New York law would not accept willful blindness as a substitute for actual knowledge in connection with aiding and abetting claims."[99] Prudential and BAS, on the other hand, point to *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*,[100] which held that "actual knowledge is required, rather than a lower standard such as recklessness or willful blindness."[101]

*Pension Committee* and BAS cite numerous cases to support the contention that conscious avoidance is the same as or similar to constructive knowledge and therefore insufficient for aiding and abetting claims. The cases hold, however, only that constructive knowledge is insufficient, which is not disputed. But constructive knowledge and conscious avoidance are not

---

[97]

*Lerner*, 459 F.3d 273, 293.

[98]

No. 00 Civ. 2284 (DLC), 2003 WL 21436164 (S.D.N.Y. June 23, 2003).

[99]

*Id.* at *9.

[100]

446 F. Supp. 2d 163.

[101]

*Id.* at 201 n.279.

equivalent. Constructive knowledge is "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person."[102] Conscious avoidance, on the other hand, occurs when "it can almost be said that the defendant actually knew" because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.[103] Conscious avoidance therefore involves a culpable state of mind whereas constructive knowledge imputes a state of mind on a theory of negligence. Reflecting this analysis, the Second Circuit has held in the criminal context that conscious avoidance may satisfy the knowledge prong of an aiding and abetting charge.[104] Accordingly, the Court sees no reason to spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers.

> 3.   *This Case*
>
>> a.   *Prudential – Spring 2000*

Plaintiffs allege that "Prudential knowingly played a significant role in Beacon Hill's

---

[102]

BLACK'S LAW DICTIONARY (8th ed. 2004) (knowledge).

[103]

*United States v. Nektalov*, 461 F.3d 309, 315 (2d Cir. 2006) (quoting *United States v. Reyes* 302 F.3d 48, 54 (2d Cir. 2002) (quoting GLANVILLE WILLIAMS, CRIMINAL LAW: THE GENERAL PART § 57, at 159 (2d ed.1961))).

[104]

*See United States v. Bakal*, 20 Fed. Appx. 37, 42 (2d Cir. 2001) (conscious avoidance theory of knowledge not *per se* inapplicable to specific intent crimes like aiding and abetting); *cf. United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001) (conscious avoidance can establish knowledge of criminal endeavors, although not specific intent to participate in substantive crimes, for purposes of general aiding and abetting statute, 18 U.S.C. § 2).

fraudulent valuation of the securities in Bristol's portfolio"[105] and that "Prudential knew that Beacon Hill was providing the values purportedly generated by Prudential – but, in fact, based on Beacon Hill's 'hedge alloc' spreadsheet – to Bristol's auditors."[106]

The only non-conclusory allegation regarding Prudential's knowledge is the assertion that Kearney responded to Daniels' April 12, 2000 list of CMOs and their Beacon Hill-determined values with an identical list on Prudential letterhead. Plaintiffs suggest that this strongly suggests culpable knowledge on the part of Kearney both because Beacon Hill's inclusion of its own prices signaled to Kearney the desired answer and because Kearney's response with identical prices is most unlikely to have reflected any independent valuation by Prudential.

The fact that Beacon Hill sent its values to Prudential is ambiguous. The allegation supports the inference that Prudential knew the values to be false and rubber stamped them because it was colluding with Beacon Hill. But it is consistent also with the inference that Prudential thought that Beacon Hill was asking in good faith to have its values examined and, if need be, corrected.

The meaning of Kearney's response is ambiguous as well. Certainly the fact that Kearney responded with an identical set of values indicates that he did not value the CMOs independently.[107] But that is not enough. That Kearney rubber stamped Beacon Hill's values is

---

[105]    Cpt. ¶ 392.

[106]    *Id.* ¶ 79.

[107]    Prudential argues that the allegation that Kearney took two days to respond to Daniels is consistent with the inference that Prudential took the time to verify the values independently. This is not persuasive. Given the nature of CMOs and the judgment that is required to value them, for Prudential to have conducted an independent valuation and arrived at 31 identical values as Beacon Hill would have been an amazing coincidence. But this ultimately is beside the point. For the reasons stated in the text, even if Kearney had not

consistent either with laziness or with a dishonest attempt to provide Beacon Hill with the appearance of independent corroboration when in fact he did not determine the values himself. But even if one assumed that it reflected dishonesty, the SAC would not sufficiently allege facts from which Kearney could be said to have known or consciously disregarded Beacon Hill's fraud, at least in the absence of allegations that Prudential or Kearney had any motive to assist Beacon Hill.

The SAC therefore fails to allege facts strongly supporting an inference of knowledge on Prudential's part.

### b. *BAS – Spring 2001*

Plaintiffs' allegations that BAS knew of the Beacon Hill fraud during the spring of 2001 are insufficient as well. The SAC alleges that BAS supplied Beacon Hill with "35 'corroborating' values,"[108] which it "knew to be false."[109]

The only non-conclusory allegations of BAS's knowledge during this period concern BAS's pricing of GECMS 1998-13. The SAC alleges that Beacon Hill obtained from BAS a March month-end price of $118.31 for the bond to corroborate its own value of $118.04, which was about $18 higher than the value Bear Stearns assigned.

The problem with these allegations is that they are consistent with the inference that BAS conducted an independent valuation of GECMS 1998-13. BAS's mark was not identical to

---

conducted an independent valuation, this would not necessarily indicate that he or anyone else at Prudential knew that Beacon Hill's values were phony.

[108]      *Id.* ¶ 84.

[109]      *Id.* ¶ 8.

Beacon Hill's. Moreover, plaintiffs fail to allege the manner in which Beacon Hill requested corroboration, when it did so, when BAS responded, or when BAS's mark was sent to E&Y. Essentially, plaintiffs allege only that BAS's mark was close to Beacon Hill's and that BAS therefore must have known that Beacon Hill's value was false.

Furthermore, the fact that BAS's mark was about $18 higher than Bear Stearns' says little about BAS's knowledge of Beacon Hill's assumed wrongdoing. Bear Stearns arrived at its lower value on April 9, 2001. Plaintiffs do not allege when BAS provided its mark for GECMS 1998-13. As Bristol's 2001 audited financial statement was not released until May 24, the allegations are consistent with the inference that BAS conducted an independent valuation of GECMS 1998-13 several weeks after Bear Stearns and therefore was able to take account of more recently available market information.

Finally, plaintiffs' allegations of motive are unavailing. They allege that Beacon Hill offered BAS substantial business if it hired Kearney. But this does not indicate that BAS stood to gain from helping Beacon Hill commit fraud. It suggests at most that BAS had a motive to hire Kearney to acquire new business. And while Beacon Hill may have helped Kearney acquire a new job, the SAC does not allege facts suggesting that once Kearney was employed at BAS, he would have gained anything more from Beacon Hill by aiding a fraudulent valuation scheme.

> c. *BAS – Spring 2002*

Plaintiffs' allegations concerning the spring of 2002 are another matter.

The SAC alleges that, in May 2002, Irwin had an exchange with Kearney resembling the one Daniels had two years earlier while Kearney was at Prudential. Irwin sent a list of values to

Kearney who in turn rubber stamped them. But there was a key difference.

Plaintiffs allege that when Irwin sent Beacon Hill's values to Kearney in May 2002, he specifically asked that the values be placed on BAS letterhead. The significance of this allegation is that, if true, it would suggest strongly that BAS knew that Beacon Hill was not asking to have its values corrected, but wanted BAS blindly to confirm them. It is reasonable to infer that BAS knew that Beacon Hill would not have made such a request if it thought that BAS's independent valuation would produce corroborative marks. In other words, the most likely explanation for Beacon Hill's request is that it thought its prices were beyond the range of what could be corroborated and therefore not reflective of the market values of the CMOs.

These allegations tend to show either that BAS knew that the values were false or that it was aware of the possibility that they were phony, but nevertheless complied with Beacon Hill's request and sent the rubber stamped values directly to E&Y without inquiring as to the values' potential falsity. This especially is so in light of the allegation that BAS sent its "corroborating" values directly to E&Y and therefore knew that Beacon Hill was providing its auditors with ostensibly independent marks that were not in fact arrived at independently.

Accordingly, plaintiffs adequately have alleged BAS's knowledge of Beacon Hill's primary violation in connection with the Master Fund's March 2002 audit.

C.    *Substantial Assistance*

"Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [fraud or breach of fiduciary duty] to

occur."[110] In addition, substantial assistance is intimately related to the concept of proximate cause. "[W]hether the assistance is substantial or not is measured . . . by whether the action of the aider and abettor proximately caused the harm on which the primary liability is predicated."[111]

### 1.      Proximate Cause

In the aiding and abetting context, a plaintiff must allege that the defendant's substantial assistance in the primary violation proximately caused the harm on which the primary liability is predicated.[112] Plaintiffs must allege more than but-for causation. They must allege also that their injury was "a direct or reasonably foreseeable result of the conduct."[113]

Furthermore, in the context of an aiding and abetting claim, where the alleged primary

---

[110]

*Lerner*, 459 F.3d at 295 (quoting *Kaufman*, 307 A.D.2d at 126, 760 N.Y.S.2d at 170).

[111]

*Pension Comm.*, 446 F. Supp. 2d at 202 (quoting *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005)).

[112]

*Id.* at 201-02 (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d Cir. 1992), *abrogated on other grounds*, *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993)).

[113]

*Id.*

There is some debate about whether proximate cause and substantial assistance ought to be equated in the aiding and abetting context. *See Winnick*, 406 F. Supp. 2d at 256 n.6 (S.D.N.Y. 2005) ("This Court has some doubt about whether 'substantial assistance' can be equated with proximate cause. A person can make a meaningful contribution to a fraudulent scheme without being understood to have legally 'caused' the scheme or its results."); *see also In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 34 (E.D.N.Y. 2006) ("[S]ome question has been expressed whether the 'proximate cause' standard or a lesser standard should be utilized in the context of aiding and abetting liability."). Nevertheless, as the *Winnick* court recognized, "the Second Circuit has utilized the 'proximate cause' standard in the context of aiding and abetting securities fraud." *Winnick*, 406 F. Supp. 2d at 256 n.6 (citing *Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir. 1979), *superseded on other grounds*, *Cent. Bank*, 511 U.S. 164). And in any event, as will become clear, plaintiffs adequately plead proximate cause.

violations consist of misrepresentations in a document, the defendant must be alleged to have given substantial assistance to the making and dissemination of that document.[114] This stems from the relationship between substantial assistance and proximate cause. If plaintiffs were to rely to their detriment on a misstatement, but the alleged aider and abettor did not assist in the making or dissemination of that statement, the plaintiffs, in most situations, could not say that their losses were proximately caused by the aider and abettor's actions.[115]

The only misrepresentation at issue is Beacon Hill's statement of the Master Fund's NAV in its 2002 audited financial statement. Plaintiffs have failed to allege Prudential's or BAS's knowledge of the falsity of any other statement by the Beacon Hill Defendants. Accordingly, in order to plead causation and therefore substantial assistance, plaintiffs must allege that they received and relied upon the Master Fund's 2002 audited financial statement.

Certain plaintiffs have failed to do so, including Antarctica Market Neutral Fund, Ltd. ("Antarctica"), the Balentine Plaintiffs, Credit Agricole Indosuez Luxembourg ("Credit Agricole"), Sanpaolo IMI Alternative Investments SGR SpA. ("Sanpaolo"), Crestline Offshore Fund, Ltd. ("Crestline"), Erik A. Hartog, Private Space, Ltd. ("Private Space"), and Pooled Funds, Inc. ("Pooled

---

[114]

*Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) (citing *Terrydale*, 549 F. Supp. 529, 531); *In re Union Carbide Corp. Consumer Prods. Bus. Secs. Litig.*, 666 F. Supp. 547, 560 (S.D.N.Y. 1987).

[115]

In *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308 (S.D.N.Y. 1997), the court held that where plaintiffs "allege a highly interdependent scheme in which both parties benefitted from . . . fraudulent activity . . . . allegations that a defendant actively assisted and facilitated the fraudulent scheme itself, as opposed to assisting in the preparation of the documents themselves, are sufficient." *Id.* at 1328.

*ABF* does not apply here, however, as plaintiffs have not alleged that Beacon Hill and BAS were in a "symbiotic" relationship, or that BAS actively played a role in the bad faith determination of CMO values. *See id.* at 1330.

Funds"). These plaintiffs allege only that they received statements of NAVs appearing in other documents.[116] They therefore have failed to allege that BAS's actions caused their continued investment in the Funds while their losses were being concealed by the Beacon Hill Defendants.

The remaining plaintiffs, on the other hand, allege that they received and relied upon the Master Fund's 2002 audited financial statement.[117] Taking the allegations in the SAC as true, a jury would be entitled to find that Beacon Hill would have been required to reveal in the audited financial statement that the fund was losing money if BAS had not assisted Beacon Hill as it did and that these plaintiffs would have avoided substantial losses by pulling out before the collapse in the fall of 2002.

Furthermore, the SAC supports the inference that BAS was aware that the CMO values it confirmed in May 2002 were phony. Additionally, that BAS sent its "corroborating" values directly to E&Y shows that it knew that the values would be used for audit purposes. From this it is reasonable to infer that it was foreseeable to BAS that its actions would permit Beacon Hill to overstate CMO values without alerting auditors that independent corroboration did not exist.

BAS nevertheless argues that the SAC does not allege proximate cause. It cites *Kolbeck v. LIT America, Inc.*,[118] in which a commodities trader, Schindler, was alleged to have concealed from investors that he was not registered as a futures commission merchant with the

---

[116]
  See Cpt. ¶¶ 164 (Antarctica), 179 (Balentine Plaintiffs), 186 (Credit Agricole), 231 (Sanpaolo), 243-250 (Crestline), 267 (Hartog), 275 (Private Space), 286-291 (Pooled Funds).

[117]
  See generally id. ¶¶ 150-291 (alleging plaintiffs' receipt of documents sent by Beacon Hill, including audited financial statements).

[118]
  939 F. Supp 240.

Commodities Futures Trading Commission ("CFTC"). The plaintiffs sued two brokers for clearing Schindler's trades. They contended that the brokers aided and abetted a breach of fiduciary by failing to investigate whether Schindler was registered. According to the plaintiffs, if the brokers had ceased doing business with Schindler, or had required him to register with the CFTC, plaintiffs would not have suffered losses. The court held that the plaintiffs had not pleaded proximate cause because "Schindler's failure to register, and defendants' failure to investigate that lapse, had little if anything to do with plaintiffs' losses," and because the plaintiffs' theory involved a "chain of causation . . . [that was] far too long to constitute proximate cause."[119]

       BAS's reliance on *Kolbeck* is misplaced. The clearing brokers there were alleged merely to have failed to discover acts of deception by Schindler. Here, by contrast, BAS is alleged to have known about and participated actively in Beacon Hill's scheme by sending fake corroboration to auditors. Additionally, plaintiffs' alleged losses allegedly were directly attributable to BAS's misbehavior. A jury could find that by rubber stamping and submitting phony marks to E&Y, BAS made it possible for Beacon Hill to overstate NAVs without E&Y detecting the misstatements and revealing them to plaintiffs.

       Accordingly, plaintiffs—except for Antarctica, the Balentine Plaintiffs, Credit Agricole, Sanpaolo, Crestline, Hartog, Private Space, and Pooled Funds—have alleged causation for purposes of the substantial assistance prong.

       2.    *Routine Activity*

       BAS argues also that plaintiffs have failed to plead substantial assistance because "the

---

[119]    *Id.* at 249.

provision of marks is not unusual for a broker, and, indeed, is part of its normal course of conduct."[120] It cites *Greenberg v. Bear, Stearns, & Co.*[121] and *Kaufman v. Cohen*[122] for the proposition that there is no substantial assistance where the conduct of the alleged aiders and abettors is routine and within their normal course of business.[123]

This is unavailing. While it may be routine for brokers to provide marks, BAS's alleged activity here was anything but routine. What is routine, according to the SAC, is for a broker to arrive at independent valuations, not to take a list of CMO values provided to it by a hedge fund manager, put the list on its own letterhead at the request of the manager, and then send the list directly to the hedge fund's auditor.

III.     *Oran's Standing*

BAS next challenges Oran's standing. It argues that the SAC fails to allege either that Oran owned shares in the Funds at times relevant to the SAC, or that someone who did expressly assigned its claims to Oran.

---

[120]

BAS Mem. 18.

[121]

220 F.3d 22 (2d Cir. 2000).

[122]

307 A.D.2d 113, 760 N.Y.S.2d 157.

[123]

*See Greenberg*, 220 F.3d at 29 ("[T]he simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker." (quoting *Stander v. Fin. Clearing & Servs. Corp.*, 730 F. Supp. 1282, 1286 (S.D.N.Y.1990)); *Kaufman*, 307 A.D.2d at 126, 760 N.Y.S.2d at 170 (assisting someone in acquiring an interest in a piece of property was "not an unusual activity for those in the business of commercial real estate development" and so did not give rise to liability for aiding and abetting breach of fiduciary duty).

Plaintiffs must plead facts that, if true, would establish standing.[124] In addition, while causes of action are freely assignable in New York,[125] the New York courts have held that "in the absence of an explicit assignment of a cause of action based on fraud, 'only the . . . assignor may rescind or sue for damages for fraud and deceit'" because where "the representations were made to" the assignor, he or she "alone had the right to rely upon them."[126]

---

[124]

*E.g.*, *Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey*, 85 F.3d 970, 973 (2d Cir. 1996) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)).

[125]

N.Y. GEN. OBLIG. LAW § 13-101.

[126]

*Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 151 (2d Cir. 1995) (quoting *Nearpark Realty Corp. v. City Invest. Co.*, 112 N.Y.S.2d 816, 817 (Sup. Ct. N.Y. Co. 1952) (citing *Fox v. Hirschfeld*, 157 A.D. 364, 142 N.Y.S. 261 (1st Dep't 1913))); *accord In re Nucorp Energy Secs. Litig.*, 772 F.2d 1486, 1493 (9th Cir. 1985) (applying New York law and citing *Licht v. Donaldson, Lufkin & Jenrette Secs. Corp.*, No. 24560/82, slip op. (Sup. Ct. N.Y. Co. Sept. 1 1983), *aff'd mem.*, 100 A.D.2d 987, 474 N.Y.S.2d 1004, *appeal denied*, 63 N.Y.2d 608, 472 N.E.2d 1044 (1984)); *Lowry v. Baltimore and Ohio R. Co.*, 629 F. Supp. 532, 534 (W.D. Pa. 1986) (applying New York law).

Plaintiffs contend that this rule is not applicable here because *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 97 N.Y.2d 456, 741 N.Y.S.2d 181 (2002), held that "the buyer of a bond receives exactly the same 'claims or demands' as the seller held before the transfer." *Id.* at 461, 741 N.Y.S.2d at 184. But *Bluebird Partners* is inapposite. That case applied General Obligations Law § 13-107, which provides that "[u]nless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands" against (a) the bond obligor, (b) the indenture trustee or depository, or (c) the guarantor of the obligation. N.Y. GEN. OBLIG. LAW § 13-107. This case concerns interests in hedge funds, not bonds. Accordingly, § 13-107 has no applicability here.

Furthermore, while the Uniform Commercial Code provides that the purchaser of a security "acquires all rights in the security that the transferor had or had power to transfer," N.Y. U.C.C. § 8-302(a), the term "rights in the security" does not mean "all rights *related* to the security or *accrued while possessing the security*." *Consol. Edison, Inc. v. Northeast Utils.*, 318 F. Supp. 2d 181, 188 (S.D.N.Y. 2004) (rejecting argument that N.Y. U.C.C. § 8-302(a) provides for automatic transfer of accrued claims), *rev'd on other grounds*, 426 F.3d 524 (2d Cir. 2005). Section 8-302(a) thus primarily concerns issues of title, such as defenses against enforcement of ownership rights. *Id.* at 191. It does not provide for the automatic transfer of fraud claims against third parties. *See id.* at 192-93 ("[U]pon the transfer of stock, the transferee receives rights in the security vis-à-vis the issuer and rights vis-à-vis

The SAC alleges that TEB Turkish Premier Fund, Ltd. ("TEB") invested in Bristol in 2001 and sold a portion of its shares in 2004 to a third party, which plaintiffs identify in their memorandum as Deutsche Bank AG, London ("Deutsche Bank"). Deutsche Bank in turn transferred the shares to Oran in December 2005.[127] The SAC does not allege either that TEB expressly assigned its claims to Deutsche Bank or, if it did, that Deutsche Bank expressly assigned those claims to Oran. It therefore does not adequately plead Oran's standing.[128]

### IV.   Punitive Damages

"Under New York law, punitive damages are appropriate in cases involving gross,

---

other potential holders, including, for example, good title and bona fide purchaser status. Nothing in the text of § 8-302(a), in its history or commentary, or in other provisions of the U.C.C. supports [the] proposition that "rights in the security" include contract rights against third parties or that § 8-302(a) codifies a rule for the automatic transfer of such rights to subsequent purchasers of the stock.").

[127]

Cpt. ¶ 14(oo).

[128]

Plaintiffs urge the Court to consider the purchase agreements between TEB and Deutsche Bank, Faurot Aff. (docket item 152) Ex. A, and Deutsche Bank and Oran, *id.* Ex. C, each of which, they argue, expressly assigned claims. Even if the Court were to rely on these documents – and it is not clear that it could do so, as they neither were attached to the SAC, incorporated by reference, nor relied upon by Oran in making its claims, *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) – the result would be the same. Plaintiffs argue that §§ 1.01, 6.01, and 6.04 of the TEB-Deutsche Bank agreement demonstrate TEB's intent to assign its claims. But plaintiffs misread the language. Section 1.01 provided that TEB would transfer its shares in Bristol free of any encumbrances. Section 6.01 required each party to use reasonable efforts to effectuate the agreement. And Section 6.04 required TEB to cause Bristol to execute all documents necessary to consummate the transfer of shares and evidence Deutsche Bank's ownership. *See* Faurot Aff. Ex. A, §§ 1.01, 6.01, 6.04. None of these clauses expressly provided for assignment of claims.

Notably, the purchase agreement between Deutsche Bank and Oran did provide expressly for assignment. *See id.*, Ex. C, § 1.02. But this does not help plaintiffs. If TEB did not assign its claims to Deutsche Bank, Deutsche Bank had no claims to assign Oran.

48

wanton, or willful fraud or other morally culpable conduct. Such conduct need not be directed at the general public."[129] "While intentional conduct is not a mandatory showing for punitive damages, the conduct generally must be so reckless or wantonly negligent as to be the equivalent of a conscious disregard of the rights of others."[130]

Here, the allegations against BAS are sufficient to support a claim for punitive damages. According to the SAC, BAS either knew that Beacon Hill was using phony CMO values to determine NAVs or was aware of the strong possibility that the values were false but deliberately failed to find out. On the latter hypothesis, it blindly confirmed Beacon Hill's values and sent its "corroboration" directly to Beacon Hill's auditor. The allegations, if true, would support a finding that BAS knowingly participated in or assisted a scheme to deceive E&Y and ultimately plaintiffs and therefore that it consciously disregarded plaintiffs' rights.

BAS contends that plaintiffs' requests for punitive damages must be dismissed because

---

[129]

*Fraternity Fund I*, 376 F. Supp. 2d at 412 (quoting *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 509 (2d Cir. 1991) and citing *Campagnola v. Mulholland*, 76 N.Y.2d 38, 48, 556 N.Y.S.2d 239, 245, 555 N.E.2d 611 (1990)).

[130]

*Trudeau v. Cooke*, 2 A.D.3d 1133, 1134, 769 N.Y.S.2d 322, 323 (3d Dep't 2003).

plaintiffs fail to allege that BAS, as Kearney's employer, was complicit in Kearney's behavior. It points to *Loughry v. Lincoln First Bank, N.A.*,[131] in which the New York Court of Appeals held that

> "punitive damages can be imposed on an employer for the intentional wrongdoing of its employees only where management has authorized, participated in, consented to or ratified the conduct giving rise to such damages, or deliberately retained the unfit servant, or the wrong was in pursuance of a recognized business system of the entity. Put another way, this 'complicity rule' . . . results in employer liability for punitive damages only when a superior officer in the course of employment orders, participates in, or ratifies outrageous conduct."[132]

While plaintiffs do not allege Kearney's position at BAS or that a superior officer participated in or ratified his conduct, the Court is not persuaded that plaintiffs' claims for punitive damages should be dismissed at this stage. Dismissal on the pleadings is inappropriate "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief."[133] Plaintiffs may well adduce evidence that Kearney was a superior officer or, if not, that another person who was a superior officer at BAS ratified Kearney's actions.

---

[131]
    67 N.Y.2d 369, 502 N.Y.S.2d 965 (1986).

[132]
    *Id.* at 378, 502 N.Y.S.2d at 969-70 (citations omitted).

[133]
    *Cohen*, 25 F.3d at 1172 (quoting *Conley*, 355 U.S. at 45-46).

50

*Conclusion*

The motion to dismiss the SAC as to Prudential [docket item 141] is granted. The motion to dismiss the SAC as to BAS [docket item 143] is granted insofar as (1) the claims of Antarctica, the Balentine Plaintiffs, Credit Agricole, Sanpaolo, Crestline, Hartog, Oran Ltd., Private Space, and Pooled Funds are dismissed in all respects, and (2) the claims of all other plaintiffs insofar as they allege liability based on aiding and abetting prior to May 2002 all are dismissed. The motion otherwise is denied.

SO ORDERED.

Dated: March 27, 2006

_____

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)